## G. & D. TAYLOR & Co. *v.* R. G. & J. T. PLACE.

A vote of the general assembly opening judgments obtained in the court of common pleas, on writs served by garnishee process, in order to let in the garnishees to amend and permitting them to amend their affidavits on the ground that the same had been erroneously made to their disadvantage from accident or mistake, and also, setting aside a verdict obtained against the garnishees in a pending suit, brought to recover the amounts admitted by their affidavits as first filed to be attached in their hands, for the purpose of enabling them to avail themselves of such amendment, is an exercise of judicial power in the constitutional sense.

Judicial power, in the constitutional sense, defined and illustrated.

The exercise of judicial power is, by the constitution of Rhode Island, prohibited to the general assembly; and the above vote, passed by that body in an attempt to control the judgment, in a pending suit, by the exercise of such power, held, upon that ground, to be void.

THIS cause came up on certificate from the court of common pleas of the county of Providence, under the act of January session, 1854, which provides, in substance, that all constitutional questions arising in any other court, shall be certified to the supreme court, for their decision of the same. The facts certified, are, that G. & D. Taylor & Co., the plaintiffs in this suit, commenced in the court of common pleas for the county of Providence, two suits against the Oneco Manufacturing Company, for the recovery of debts due to them from that company; in the one of which, the writ was returnable at the December term, 1851, of the court, and in the other of which, the writ was returnable at the May term, 1852, of the same court. In both suits, the writs were served upon R. G. & J. T. Place, the defendants in this suit, as garnishees of the Oneco Manufacturing Company; and in both suits, the garnishees made affidavits disclosing property of the Oneco Manufacturing Company in

their hands, and judgment passed in favor of the plaintiffs, against that company. At the December term of the same court, 1852, the plaintiffs commenced this action against the defendants, as garnishees in one of the former suits, to recover from them the amount which their affidavits disclosed that they had, in their hands, belonging to the Oneco Manufacturing Company, at the time of the service upon them of the writ in the first of the before-mentioned suits of the plaintiffs against that company. At the December term of the same court, 1853, after trial, a verdict, in this suit, was obtained by the plaintiffs against the defendants, for so much of the amount disclosed to have been in their hands, as aforesaid, by their above affidavits, as was necessary to pay their claim against the Oneco Company, first sued as aforesaid; whereupon the defendants appealed to the general assembly for relief against the verdict thus obtained, upon the ground that their said affidavits were, in substance, made to disclose property of the Oneco Company in their hands, by accident and mistake, when in truth they had no such property. Due notice of the application for this relief was given to the plaintiffs, and at the January session of the general assembly, 1854, after the usual hearings before the respective committees of the two houses, the following vote was passed :—

" Upon the petition of Raymond G. Place and Jason T. Place, praying, for reasons therein stated, for new trial, and for leave to make further affidavits in a certain suit in which G. & D. Taylor & Co. are plaintiffs, and the Oneco Manufacturing Company are defendants, which suit was commenced at the December term of the court of common pleas for the county of Providence, the case in said suit being No. 1825 of the records of said court, and in which the writ bears date October 25th, 1851, wherein the said Raymond G. Place and the said Jason T. Place made affidavits as garnishees; and also in one other suit commenced at the May term of said court, 1852, wherein the said G. & D. Taylor & Co. are plaintiffs, the said Oneco Manufacturing Company are defendants, and the said Raymond G. and Jason T. Place made affidavits as garnishees respectively, as in the above-named suit, which last-named case is numbered

2334 on the records of said court, and the writ in which suit bears date March 17th, 1852;

*Voted and Resolved,* That the prayer thereof be, and the same is hereby granted; so that the said Raymond G. Place and the said Jason T. Place are hereby authorized and empowered to make further affidavits in each of said above-named cases; and said court is hereby authorized to receive the same, with the same effect, so far as affects the garnishees, as if the same had been filed at the first term of the pendency of said suits respectively; and to stay proceedings and suspend judgment in a certain suit commenced at the December term of said court, 1852, and growing out of said first above-named suits; in which said suit, said G. & D. Taylor & Co. are plaintiffs, and the said Raymond G. Place and Jason T. Place are defendants, until such new affidavits be filed, and a new trial be had therein, the number of said suit being 2720 of the records of said court. *Provided,* that this act shall in no ways affect the judgments already obtained against said Oneco Manufacturing Company in said cases, other than is hereinafter provided for the payment of the costs therein; and *provided* also, that said Raymond G. Place and Jason T. Place shall first, before making such further affidavits, pay into court all the taxed costs, up to the time of filing such new affidavits, in the above-named cases, and in case numbered 2720, in which a verdict was rendered for the plaintiffs at the present December term of said court, 1853; *and provided further,* that in case the said R. G. & J. T. Place, upon the new trial in said last-named suit, obtain a judgment in their favor, no costs shall be taxed against said G. & D. Taylor & Co. accruing before the filing of such further affidavits; and such further affidavits to be filed on or before the second Monday of the next term of said court."

At the December term of the above court of common pleas, 1855, this case came on again, to be heard upon the new trial granted by the above act, and upon the new affidavits which the defendants, as garnishees, were authorized thereby to make; whereupon, the plaintiffs protested against the court's receiving the new affidavits, or entertaining any further hearing or proceedings whatsoever thereupon, because they averred and claimed

that the above act, authorizing such affidavits, new trial, hear‌ing, and proceedings, was unconstitutional and void. The court, however, proceeded, in accordance with the statute providing the mode of trying constitutional questions, with the cause, ruling, as the statute directed, the above vote and resolution of the general assembly to be constitutional; and by virtue of the vote and resolution of the general assembly, heard the cause again, under the new affidavits. The cause was held for advisement until the June term of the court, 1856, when, finding that the new affidavits, authorized by the general assembly to be filed, disclosed no property in the hands of the defendants, as garnishees in the said suit against the Oneco Company, the court rendered judgment in this suit against the plaintiffs, and certified the constitutional question raised in it, to this court for decision, and for further directions in the cause.

The question, thus certified, came on to be heard at this term, and was argued by *James Tillinghast and Bradley* for the plaintiffs, and by *Currey* for the defendants.

*Tillinghast*, for the plaintiffs, made the following points:—

1st. That the act of the general assembly, in question, was void under the constitution, as an exercise of judicial power, exclusively vested by article 3, and by article 10, section 1 of the constitution, " in one supreme court, and such inferior courts as the general assembly may, from time to time, ordain and establish." *Proprietors of Kennebec Purchase* v. *Laboree et al.* 2 Greenl. R. 275; *Townsend* v. *Griffin,* 4 Harring. 440; *Chastellux* v. *Fairchild,* 3 Harris, (15 Penn.) 18; *Lewis et al.* v. *Webb, Admr.* 3 Greenl. R. 326; *Dash* v. *Van Kleek,* 7 Johns. 477; *Couch* v. *Jeffries,* 4 Barr. 246; *Pouder, Exr.* v. *Graham,* 4 Florida, 23.

2d. That the act was void, as retrospective, and divesting vested rights, under article 1, section 10 and section 16 of the constitution; the first providing, among other things, " that no person shall be deprived of life, liberty, or property, but by judgment of his peers, or by the law of the land," and the last, " that private property shall not be taken for public use, without full compensation." *Proprietors of Kennebec Purchase* v. *Laboree et al.* 2 Greenl. R. 288; *Fletcher* v. *Peck,* 6 Cranch, 87; *Taylor* v. *Porter and Ford,* 4 Hill, 140; *Wilkinson* v. *Leland,* 2 Peters,

627, 1 Story on Const. 661; *Greenough* v. *Greenough*, 1 Jones, (11 Penn.) 489; *Irving's appeal*, 4 Harris, (16 Penn.) 256; *Pearce's heirs* v. *Patton*, 7 B. Monr. 162; *Dikeman* v. *Dikeman*, 11 Paige, 482; *Stewart* v. *Davisde*, Admr. 10 Sm. & Marsh. 351; *Butler* v. *Chariskee*, County Court, 13 Mis. 112.

3d. That the act was void, because it impaired the obligation of contracts, and thereby conflicted with article 1, section 10 of the constitution of the United States, and with article 1, section 12 of the constitution of this state; that it impaired the implied contract of the garnishees to pay the plaintiffs' debt to the amount in their hands, disclosed by the first affidavits. 3 Story on Const. §§ 1370, 1371; *Lewis* v. *Breckenridge*, 1 Blackf. 220.

*Currey*, for defendants, the garnishees, contended—

1st. That the power exercised by the general assembly in the case at bar, was not, in any sense, the exercise of judicial power, the vote merely authorizing the court to exercise it, and being a special vote altering the general law, which did not permit the filing of an affidavit by a garnishee, after judgment had passed against the debtor sued. It divested no vested rights, since none were vested by a verdict, subject to the power of the court, and upon which the court had suspended judgment, for the purpose of allowing application for relief to be made to the assembly. He cited 1 Am. Dig. 126, arts. 11, 15, 16; *Iverson* v. *Schote*, 9 Ala. 713.

2d. That if this vote be considered as an exercise of judicial power, in any sense, it is an exercise of *quasi*, or partial judicial power, only. It provided a remedy where none existed before, which was within the competence and duty of the general assembly. 3 Story Const. Law, § 1379; *Butler* v. *Palmer*, 4 Hill, 324; *Commercial Bank of Natchez* v. *Chambers et al.* 8 Sm. & Marsh. 9; *Calder and wife* v. *Bull et ux.* 3 Dallas, 386; *Wilkinson* v. *Leland et al.* 2 Peters, 660.

3d. But if this vote be deemed to be a judicial act, the general assembly were warranted in exercising such power, by article 4, section 10 of the constitution, which reserves to them all customary powers not prohibited in the constitution. The assembly had exercised judicial power from its origin to the passage of the vote in question; and a prohibition in such a

case was not to be implied from the mere distribution of powers between the executive, legislative, and judicial departments of the government. The contemporaneous exposition of the constitution in this respect, is shown by the continuance, in the Digest of 1844, of the acts providing for the mode of preferring petitions for new trial to the general assembly. Digest, 1844, p. 69; *Wilkinson* v. *Leland & others*, 2 Peters, 632, n. a.; 3 R. I. Rep. Supplt. Opinion of judges of supreme court that the general assembly had constitutionally this power.

*Bradley*, in reply. The vote in question grants a *right* to the defendants, to the prejudice of the plaintiffs, to file affidavits, which, without the vote, they could not file. It *authorizes* the court to stay proceedings in the suit against the garnishees, and *empowers* the court to receive the new affidavits with the same effect, so far as they affect them, as if filed at the first term of the original suits respectively, and to stay proceedings, and to stay judgment in the suit against the garnishees. It is, in effect, a *direction* to the court to do these things; like an authority to the court to hear bills in equity, which, under such authority, becomes a judicial duty which the court cannot dispense with unless expressly empowered so to do. In such cases, words of permission, as " may," mean " shall." Dwarris on Statutes, 712, side.

The vote *directs* the court to grant a new trial to the defendants. It grants to them a *right* to file new affidavits,— which last grant resembles power given by a court of equity, to a respondent, to file a new answer, or amend an old one. It enlarges, as it were, the time in which the garnishees may file their affidavits with effect. All this, is evidently the exercise of judicial power, as is, also, the stay of proceedings against the defendants. He examined the cases from Maine, Pennsylvania, and New York, to show that the grant of new trials had always been held an exercise of judicial power.

The opinion of the judges in 3 R. I. R. Supplement on this point, he deemed a mere *obiter dictum*, upon which they gave no judgment, whilst the matter which they were called upon to answer, necessarily involved, according to the opinion they gave, the exclusion of the general assembly from the exercise of all

28 *

judicial power. The "judicial power," given by the constitution to "one supreme court, &c." means *all* judicial power, and this is *res judicata* in Rhode Island, by the above opinion of the judges. A mere practice for a few years, contrary to a constitutional provision, cannot abrogate it. He examined the various cases cited, for the purpose of showing that the vote in question was in conflict with the several constitutional provisions intended to preserve the rights of property, and to keep unimpaired the obligation of contracts ; and concluded, that if it was deemed an exercise of judicial power, it was void, because prohibited, by the constitution, to the general assembly ; if a legislative act, because it derogated from the constitutional rights of property, and the obligation of contracts.

AMES, C. J.* The substance of this case is, that after the plaintiffs had, in the regular course of judicial proceeding in the court of common pleas for the county of Providence, obtained a verdict against the defendants for a sum sufficient to pay their first judgment against the Oneco Manufacturing Company, and within the amount ascertained to be in the hands of the defendants by their affidavits as garnishees, the general assembly interfered by their vote ; ordered the judgments in the former suits to be opened for the purpose of allowing, and allowed the defendants to make new affidavits as garnishees therein with effect, on the ground that the old ones were incorrectly made through accident or mistake; and set aside the verdict in this cause, and granted a new trial therein, in order that the garnishees might avail themselves of their new affidavits upon the new trial thus granted to them. By force of this vote of the assembly, the verdict of the plaintiffs was set aside; a new trial of this cause was had by the defendants; new affidavits were filed by them, exonerating themselves from the liability which they had incurred by the old ones ; and the consequence has been, that the same court under whose direction, and according to law, a verdict in this cause was obtained by the plaintiffs, has been obliged to render a judgment therein for the defendants.

---

[1] Mr. Justice Sherman sat with the court in this case.

Some argument has been made at the bar, that the vote does not grant the defendants leave to file the new affidavits, nor stay proceedings upon the verdict against them, but merely authorizes the court of common pleas to receive the affidavits, and to stay the proceedings. Unfortunately for this construction, the vote begins with granting the prayer of the petition, the main requests of which, as appears from the recital of the vote, are, that the general assembly would grant to the petitioners a new trial in *this* cause, and the right to file new affidavits, as garnishees, with effect, in the suits against the Oneco Manufacturing Company. This is evident, too, because, next after the grant of the prayer of the petition, the vote proceeds : " So that the said Raymond G. Place and the said Jason T. Place are *hereby* authorized and empowered to make further affidavits in each of the above-named cases ;" and because, the vote nowhere authorizes the *court* to grant a new trial ; and in the last proviso, speaks of what the defendants shall do in the event of obtaining judgment upon the new trial, as if the same were already granted. The words of the vote, which immediately afterwards *authorize* the court to receive the new affidavits, were, therefore, not intended to confer any discretion in that respect, but merely the *power* to receive the affidavits in response to the right before conferred on the defendants, as garnishees, to file them. The same remark applies to the *authority* given to the court to " stay proceedings and to suspend judgment " in this suit ; for if, in a cause pending in an inferior tribunal, a verdict be set aside and a new trial granted by a superior one, the former *must* stay proceedings and suspend the entering up of judgment on the verdict.

It is hardly necessary, perhaps, after stating the purpose and effect of this vote, to use arguments or to cite authorities to show that thus to set aside a verdict and grant a new trial in a suit at law, which the frame of statutes, or even binding rules of practice place beyond the power of the court in which the cause is pending, or of any court of *law*, is the exercise of judicial power ; that to deprive one party to such a suit, of an advantage that he has obtained over the other from the mistake of the latter, or from an accident that has befallen him, is the

exercise of judicial power; and that, finally, as the means to such relief, to open judgments or decrees obtained in a court, and to allow the substitution of a new, or the amendment of an old sworn answer, either in proceedings at law or in equity, for the purpose and with the effect of reversing the relative condition of the parties to a pending suit, dependent upon the effect of that answer, is an exercise of judicial power. In the cause before us, *all* this has been done by a vote of the general assembly; and, in the analysis of this vote just given, we have described, most aptly, the substance of a decree of a court of chancery, when exercising, in a case of accident or mistake, and after solemn hearing, its high judicial functions over proceedings at law. The difference between the decree, as it would be in such a case, if a proper one for relief, and the vote in question, is not in favor of the latter; for, whereas the *decree* could act only upon the *parties* to the suit, the *vote* directs and controls the action of the legal tribunal itself.

In some cases, it is difficult to draw and apply the precise line separating the different powers of government which, under our political systems, federal and state, are, without exception, carefully distributed between the legislative, the executive, and the judicial departments. To some extent, and in some sense, each of the powers appropriated to different departments in the above distribution, must be exercised by every other department of the government, in order to the proper performance of its duty. As illustrated by Mr. Justice McLean, in giving the judgment of the supreme court of the United States, in the case of *Watkins* v. *Holman et al.* 16 Pet. 60, 61. "The executive, in acting upon claims for services rendered, may be said to exercise, if not in form, in substance, judicial power. And so a court, in the use of a discretion essential to its existence, by the adoption of rules or otherwise, may be said to legislate. A legislature, too, in providing for the payment of a claim, exercises a power in its nature judicial; but this is coupled with the paramount and remedial power." In an early case, which we shall have occasion hereafter to use for another purpose, the question came before the courts of the United States, under the clause of the constitution of the United States distributing the

different powers of the federal government amongst its different departments, whether a power, lodged, by an act of congrees, in the circuit courts of the United States, to inquire into and to take evidence of the claims of invalid pensioners, and to transmit the result of their inquiries to the secretary of war, for his action and that of congress thereon, was *judicial* power, and so the exercise of it imperative upon the circuit judges. The unanimous opinion of the circuit court for the district of New York, then consisting of Jay, chief justice, Cushing, justice, and Duane, district judge; of the circuit court for the district of Pennsylvania, then consisting of Wilson and Blair, justices, and of Peters, district judge; and of the circuit court for the district of North Carolina, then consisting of Iredell, justice, and of Sitgreaves, district justice;—was, that the power thus vested was *not* judicial, and that consequently they were not bound to exercise it. The reasons given by them were, in substance, that the act of congress did not contemplate this power as judicial, inasmuch as it subjected the decisions of the courts, in the matter to which it related, to the consideration and suspension of the secretary of war, and again to the revision of congress; whereas, by the constitution, neither the secretary of war, nor any other executive officer, *nor even the legislature,* were authorized to sit, as a court of errors, on the *judicial* acts or opinions of the courts of the United States. The judges composing the circuit court of New York, however, consented, on account of the benevolence which had dictated the passage of the pension act in question, *personally* to execute the duties imposed upon them in the character of *commissioners* appointed by *official* instead of personal descriptions; deeming themselves at liberty, as individuals, to accept or decline the office thus tendered to them. See the opinions in the note illustrating *Hayburn's case,* 2 Dallas, 410, 411, 412, and in 1 Curtis's Decis. Sup. Ct. U. S. 9, 10, and 11. In *Watkins* v. *Holman et al.* before quoted, the question arose before the supreme court of the United States, under the constitution of Alabama, containing a like distribution of powers with our own, whether an act of the legislature of that state, authorizing an administratrix residing in another state, to sell and convey, by certain attorneys named in the act,

the real estate of her intestate husband in Alabama, for the payment of his debts, her attorneys giving bond with sureties for the faithful payment of the proceeds of sale to the administratrix, " to be appropriated to the payment of the debts of the deceased," was a *judicial* act, and so within the inhibition of the constitution of Alabama. The court held the act to be valid, as the exercise, not of *judicial*, but of *legislative* power; the act providing a special remedy, merely, for a case which, on account of its circumstances, though within the spirit, was not within the *letter* of the general statute of Alabama, which directed the mode in which the real estate of a deceased debtor should be sold and applied to the payment of his debts. Again, in the late case of *United States* v. *Ferreira*, 13 Howard, 40, 48, the same court held that an act of congress, empowering the district *judge* of Florida, under the treaty with Spain of 1819, commonly called the Florida treaty, to examine and adjudge claims for injuries made by the Spanish inhabitants of Florida, provided for by a clause in that treaty, and to report his decisions, if favorable to the claimants, with the evidence, to the secretary of the treasury, for *his* discretionary action thereon, did not confer upon the district *court* of Florida *judicial* power, in the sense of the constitution of the United States, in that matter; and hence, that no appeal from the award of the judge, thus acting merely as a commissioner, could be brought to the supreme court of the United States. The court followed precisely the line of reasoning which must have been adopted by the judges in *Hayburn's case*, in 1792, as illustrated by the opinions given in the note to that case, which the court recite at large. In the opinion of the court, delivered by the present venerable chief justice, he says: " The powers conferred by these acts of congress upon the judge, as well as the secretary, are, it is true, judicial in their nature; for judgment and discretion must be exercised by both of them. But it is nothing more than the power ordinarily given by law to a commissioner appointed to adjust claims to lands or money, under a treaty; or special powers to inquire into or decide any other particular class of controversies in which the public or individuals may be concerned. A power of this description may con-

stitutionally be conferred on a secretary as well as a commissioner, but is not *judicial* in either case, in the sense in which judicial power is granted by the constitution, to the courts of the United States;" and see *American Ins. Co.* v. *Carter*, 1 Peters, 511; *Benner* v. *Porter*, 9 Howard, 235; *United States* v. *Ritchie*, 17 Howard, 533, 534. Upon the same principle, the decisions of the various state auditors of this and other states, or even of the court of claims, recently established at Washington, though this latter sits as a court, takes and receives evidence, and hears counsel as a court, subject, as they all are, to the revision and control of their respective legislatures or of congress, are not *judicial* decisions, in the sense of the constitution of the states, or of the United States. They may, and the latter does, task high judicial capacity, learning, and experience, and is *called* a *court*; but after all, these officers, and the members of this tribunal, sit as auditors only, and not as *judges*, in any constitutional sense. " That the auditing of the accounts of a receiver of public moneys," says Mr. Justice Curtis, in recently delivering the opinion of the supreme court in *Murray's lessee et al.* v. *Hoboken Land and Improvement Company*, 18 Howard, 280, " may be, in an enlarged sense, a judicial act, must be admitted. So are those administrative duties, the performance of which involves an inquiry into the existence of facts, and the application to them of rules of law. In this sense, the act of the President in calling out the militia, under the act of 1795, or of a commissioner, who makes a certificate for the extradition of a criminal, under a treaty, is judicial. But it is not sufficient to bring such matters under the judicial power, that they involve the exercise of judgment upon law and fact." One of the points decided in this case was, that the auditing of an account, and ascertaining a balance, by the first auditor of the treasury of the United States, and the issue of a distress warrant by the solicitor of the treasury, under an act of congress, by virtue of, and under which, the lands of a defaulting collector of the customs, were seized and held to satisfy the balance ascertained by the auditor to be due to the treasury, were not acts of *judicial* power, in the sense of the constitution; that they might, therefore, under the law, be constitutionally, and with effect,

done by those officers, although neither of them constituted a *court*, nor were so connected with a court as to perform any, even of the ministerial duties, which arise out of judicial proceedings. *Murray's lessee et al.* v. *Hoboken Land and Improvement Company*, 18 Howard, 275.

On the other hand, it may safely be said, that to hear and decide adversary suits at law and in equity, with the power of rendering judgments and entering up decrees according to the decision, to be executed by the process and power of the tribunal deciding, or of another tribunal acting under its orders and according to its direction, *is* the exercise of *judicial* power, in the constitutional sense; and that it is so, whether the decision be final, or subject to reversal on error or appeal. It is precisely thus, that the great exemplar of constitutional law, the constitution of the United States, defines this power; for, after vesting, by the first section of its third article, " the judicial power of the United States," in " one supreme court, and in such inferior courts as congress may, from time to time, order and establish;" and after, in the same section, fixing the tenure and mode of compensating the judges of the courts of the United States; it proceeds, in the second section of the same article, to define this power, by stating the *cases* and *controversies* in law and equity, and of admiralty and maritime jurisdiction, to which, from the nature of the questions involved in them, or of the principles of decision to be applied to them, or from the character or citizenship of the parties to them, or to be affected by them, this power, whether original or appellate, shall extend. In *Osborn* v. *The Bank of the United States*, 9 Wheaton, 319, Chief Justice Marshall, in delivering the opinion of the court, after saying that the second article of the constitution vests the whole executive power in the President, and that the third article, among other things, declares, " that the judicial power shall extend to all cases in law and equity, arising under this constitution, the laws of the United States, and treaties made, or which shall be made under their authority," thus speaks of the effect and extent of the latter : " This clause enables the judicial department to receive jurisdiction to the full extent of the constitution, laws, and treaties of the United States, *when any*

*question respecting them shall assume such a form that the judi-
cial power is capable of acting upon it. That power is capable
of acting only* when the subject is submitted to it *by a party
who asserts his rights in the form prescribed by law.* It then
becomes a *case;* and the constitution declares that the judicial
power shall extend to all CASES arising under the constitution,
laws, and treaties of the United States." The judicial power
is exercised in the decision of *cases;* the legislative, in making
general regulations, by the enactment of laws. The latter acts
from considerations of public policy; the former is guided by
the pleadings and evidence in *the case.* Per Mr. Justice McLean.
*State of Pennsylvania* v. *Wheeling & Belmont Bridge. Co.* 18
Howard, 440. Indeed, laws and courts have their origin in the
necessity of rules and means to enforce them, to be applied to
cases and controversies within their jurisdiction; and our whole
idea of judicial power is, the power of the latter to apply the
former to the decision of those cases and controversies. To
affect to decide, or to control the decision, of a case or contro-
versy which has arisen at law or in equity, or to interfere with
its progress, or to alter its condition in any way, is to assume
the exercise of judicial power; and that, too, although the sub-
ject of the case or controversy might have been such in its
nature, that the legislature could have acted upon it, had it seen
fit, without the aid of the courts. Thus, from the case before
cited for illustration, it appears that congress may collect, under
its laws, through the action of the *executive* officers of the
United States, auditors and solicitors of the treasury, balances
due to the United States from the receivers of public money,
without the aid of the courts; that is, without encroaching
upon the just claims of the judicial department of the govern-
ment. But, inasmuch as it is competent for the United States
to sue any of its debtors in a court of law, or to consent, upon
such conditions and with such restrictions as congress may see
fit to impose, to be sued itself; and the courts of the United
States have jurisdiction, by the constitution, in all cases to
which the United States is a party; if such a suit were brought
and pending in a court of the United States, it would be so
completely within the control of the judicial department of the

government, that congress, by its subsequent action, could no more control its progress or decision, than any other party, or agent of a party to a pending suit. Though not, in its nature, necessarily a matter of judicial cognizance, being made such by the duly authorized act of the proper department of the government, it is, thereby, placed beyond the reach of that department; since any attempt, on its part, to exercise its governmental power over the action of the court, or the condition or decision of the suit, would be the exercise of judicial power. *Murray's Lessee et al.* v. *Hoboken Land and Improvement Company*, 18 Howard, 283, 284. Indeed, it is held by the highest authority upon such a subject, that whilst, under the constitution of the United States, there are matters, which, from their nature, cannot be made the subject of judicial cognizance; and again, matters, which from their nature—as the proper subjects of a suit at law, or in equity, or the admiralty—cannot be withdrawn by congress, from judicial cognizance; there are also matters involving public rights, which may be presented in *such form*, that the judicial power is capable of acting upon them, although congress may, or may not, bring them within the cognizance of the courts of the United States, as it sees fit. Ibid. 285.

But, without pursuing any further the cases illustrating what is, and what is not, judicial power, in a constitutional sense; we think that every one must admit, that the court of common pleas for the county of Providence, when, in the suits of the plaintiffs in this case against the Oneco Manufacturing Co. it attached, by its process, the property of that company in the hands of the defendants; received the affidavits of the latter, and upon the basis of them, and for the purpose of enforcing the attachment, gave judgment against the company; that when, as the next step in the stated course of such proceeding, under our law, it entertained, heard with a jury, and took their verdict, found, under its direction, for the plaintiffs in this case, against the defendants, as garnishees in the former suits, *it was* in the exercise of judicial power in the most rigid constitutional sense of the term. It was, in a matter placed by law within its jurisdiction, applying the established rules of that law to a case

brought by the plaintiffs against the defendants, for the purpose of having the court apply to it, and to enforce in their favor, those rules. To interfere with this jurisdiction; to disturb and control the exercise of this power in such a case; to take the case out of the settled course of judicial proceeding in that court; to set aside its verdict; to open its past judgment; and to give the defendants leave to amend their affidavits, was, therefore, not only the exercise of judicial power on the part of the general assembly over this court and case, but of judicial power of the most eminent and controlling character. In describing the power and jurisdiction of the Court of King's Bench, in England, Blackstone, in a passage in his Commentaries, thus speaks of it: " The jurisdiction of this court is very high and transcendent. It keeps all inferior jurisdictions within the bounds of their authority; and may either remove their proceedings to be determined here, or prohibit their progress below. It superintends all civil corporations in the kingdom. It commands magistrates and others to do what their duty requires, in any case in which there is no other specific remedy." 3 Black. Com. 42. The learned commentator is here alluding to the power of that court to issue the prerogative writs of *prohibition*, *mandamus*, and *quo warranto*, the wielding of which is, by the constitutions of some of these states, and in this state, given to the highest tribunal in the state, as a means to enable it to exercise its highest judicial functions, by controlling the exercise, or directing the erroneous or deficient action of all inferior tribunals and magistrates. Surely, not one of these courts ever dreamed, that, in the exercise of this transcendent power, they were not exercising *judicial* power in the highest, though in the strictest constitutional sense of that term; in which they were to be guided by the law, in their judgment and mode of action, and for which, they were, under the law, to be accountable as *judges*. The power which this court could exercise, by prohibition and mandamus, over an inferior tribunal, subject to it by the law, is, in part, the species of power which the general assembly has exercised in this case, over the court of common pleas for the county of Providence. The difference is, that the court could and would exercise such a power only under and

according to law ; whereas the general assembly has assumed to do it, by dispensing with the law, and substituting its own will, as a law special to the case ; and assumed, as a superior tribunal, to control both the court and the case, so as to place the case in such a position that the court might and must apply the special law to it. Grant that the vote in question, so far as it dispensed with the general law applicable to this case, and made a new law for it, was remedial and legislative in its character; yet this, certainly, would not prevent it from being also judicial, so far as it set aside a verdict, and granted a new trial in a case pending in a court of law, or so far as it opened final judgments in such a court, and gave authority to the defendants to amend their old affidavits as garnishees, or to substitute new ones, *nunc pro tunc*, in their place. That the general assembly assumed judicial power in this case, that it might render efficient the application of its legislative power to it, does not render the former assumption less, nor the power assumed less *judicial* in its nature and character, in the constitutional sense of that power. We deem the passing of this vote, however, as already suggested, to be, and to have been intended to be, an exercise, by the general assembly, of chancery powers over proceedings in a suit pending in a court of law, in a case of supposed accident or mistake; and the vote itself, to be the assembly's decree, as the highest court of equity in the state, made by it, after hearing both parties to the suit, upon due notice given, before the judiciary committees of its respective houses. Such a jurisdiction was familiarly exercised by the general assembly, during the colonial period of our history, and after we became a state, down to the adoption of our constitution in 1843, and even, though more unfrequently, since. That the assembly may not have pursued the principles, or adopted the precise mode of relief in such a court; that it acted directly upon the court, instead of upon the parties plaintiff proceeding in it, might have arisen either from forgetfulness of the principles and practice of a court of chancery, or from that forceful disposition which a departed statesman deemed would naturally accompany a legislative body, vested with, or assuming to exercise judicial power. Alexander Hamilton, Federalist, No. 83, page 325, 6th edition.

Whichever way it be viewed, we deem this vote an assumption, on the part of the general assembly, of judicial power of the highest character. We have treated this question at large, and have cited cases and opinions of the highest authority bearing upon it; not because, from a first view, we had any doubt upon it, but because the able counsel for the defendants placed the weight of his argument upon the point, that the passing of this vote was not the exercise of judicial power in any sense; or, at most, was the exercise of *quasi* judicial power only; such as either the executive or legislative departments of a government must sometimes exercise in order to the due performance of their proper functions. We have another reason for this course, which we deem, in such a matter, of the last consequence;—that we may thereby indicate the *limits*, as well as the *extent* of the decision which we feel called upon to make, lest any should suppose, that, transgressing our proper office of resisting and restraining unconstitutional assumptions of power, we intended to detract from the just powers of the other departments of our state government.

Has the general assembly of this state, under the constitution, the right to exercise *judicial* power? or, is the exercise of such power prohibited to it by the constitution?

If the law-making department in our government, has also the power to interpret and to enforce their interpretation of the laws, either acting wholly by itself, or by directing and controlling, as a superior tribunal, all other tribunals of the state, every friend to a settled and well-ordered administration of justice amongst us—every lover of free government itself—has, indeed, cause to mourn. It was the celebrated maxim of Montesquieu, that "there can be no liberty where the legislative and executive powers are united in the same person or body of magistrates;" or, "if the power of judging be not separated from the legislative and executive powers." For the first part of this maxim, the reason, tersely given, is, "because apprehensions may arise lest *the same* monarch or senate should *enact* tyrannical laws, to *execute* them in a tyrannical manner;" and for the latter portion of the maxim, "if the power to judge be joined with the power to legislate, the life and liberty of the

29 *

subject would be exposed to arbitrary control, for the judge would then be the legislator; if, to the executive power, the judge might behave with all the violence of an oppressor." If this distinguished political critic derived this maxim from the British constitution, " as," to use his own expression, " the mirror of political liberty" in his day, how are we to regard it, illustrated and enforced, as it has been, in the federal constitution, and in every state constitution of these United States, whether framed and adopted by those who sat by the cradle, or by those who have ministered to the generous manhood of our freedom. The distinguished statesmen, who having conquered for us, in their several departments, the independence and regulated liberty which we now enjoy, secured it by so ably and successfully recommending to the people of the United States, in the numbers of the Federalist, the adoption of the constitution of the United States, have so fully explained the evils of this unhallowed union of judicial and legislative powers in one body, that we can add nothing to their comments on this subject. " From a body," says Hamilton, " which had even a partial agency in passing bad laws, we could rarely expect a disposition to temper and moderate them. in the application. The same spirit which had operated in making them, would be too apt to influence their construction; still less could it be expected, that men who had infringed the constitution, in the character of legislators, would be disposed to repair the breach, in that of judges. Nor is this all. Every reason which recommends the tenure of good behavior for judicial offices, militates against placing the judicial power, *in the last resort*, in a body composed of men chosen for a limited period. There is an absurdity in referring the determination of causes, in the first instance, to judges of permanent standing; in the last, to those of a temporary and mutable constitution. And there is still greater absurdity in subjecting the decisions of men selected for their knowledge of the laws, acquired by long and laborious study, to the revision and control of men, who, for want of the same advantage, cannot but be deficient in that knowledge. The members of the legislature will rarely be chosen with a view to those qualifications which fit men for the stations of

judges; and as, on this account, there will be great reason to apprehend all the ill consequences of defective information, so, on account of the natural propensity of such bodies to party divisions, there will be no less reason to fear that the pestilential breath of faction may poison the fountains of justice. The habit of being marshalled on opposite sides, will be too apt to stifle the voice, both of law and equity."—Federalist, No. 81, page 325, 6th ed. The evils thus depicted by a master's hand, as flowing from such an union, to the people of a wide confederacy, are not lessened, to say the least, when such an union is formed for the government of a small state like our own. In the former, individual influence is comparatively nothing; in the latter, it is every thing; and the instances are only too numerous in our past history in which this influence has been brought to bear with signal effect upon the administration of justice amongst us. An independent, responsible judiciary is the only safeguard of our property, lives, and liberties. Taught by our own experience, while the states around us have, one after one, been receding from, and yielding up this inestimable treasure to the fleeting, popular fashion of the day, the people of this state have been steadily advancing towards it, until, in the constitution adopted by them only in 1843, they supposed that they held it firmly and securely in their grasp. If the vote in question be constitutionally valid, this just expectation is but a dream—an illusion. However great the *personal influence* of him who, from time to time, may fill the executive chair of the state, may be, from his character and standing, his *official power*, under our constitution, amounts to nothing; and if the general assembly may, constitutionally, exercise *judicial* functions, then, uniting in substance, all the powers of government, it is, except so far as its power is bounded by the constitution of the United States, constitutionally omnipotent and irresponsible. If, by the constitution, the general assembly possesses *any judicial* power, there is, logically, no limit to it; it possesses all. It has only to search its ancient archives, and it can find a precedent for the exercise of every species and degree of this power—from the hearing of appeals from judgments of its superior court of judicature—from the exercise of every power which has been

exercised by courts of equity, down to the setting aside the
judgments, and granting of new trials in the pettiest cases at
law, decided by the pettiest magistrates in the colony or state.
Nor need the search extend very far back to justify this body in
such an assumption.    In the case of *Wilkinson et al.* v. *Leland
et al.* 2 Peters, 631, 632, heard before the supreme court of the
United States, in 1829, the able and experienced counsel for
the plaintiffs in error contended, that both before and since the
adoption of the constitution of the United States, the general
assembly of Rhode Island had always exercised *supreme legis-
lative, executive,* and *judicial power;* that, by one of its stand-
ing laws, it was authorized, upon petition for new trial, to set
aside the judgments of its courts, at pleasure ; that having been
originally the only court in the state, it had exercised *common*
law, *chancery, probate,* and *admiralty* jurisdiction, and *had never
parted with its chancery jurisdiction,* being, as the counsellor
termed it, " the best court of chancery in the world ; " and that
its probate power, though conferred upon inferior courts, had
always been exercised concurrently with them, as proved by its
frequent probate of wills and grants of administration.    In the
note to the 632d page of the above volume of reports, on which
page commences an abstract of the argument of the learned
counsellor, a series of instances are given, extending from 1771
to 1793,—and these must have been but a selection,—in which
the assertion of the counsellor, so far as the exercise of the
power is concerned, is fully proved ; for these instances, to
which we have been referred by the counsel for the defendants
to instruct our judgment, embrace grants of new trial, amend-
ments of court records, *orders* to the supreme court of the
colony to carry into effect the decrees of the king in council,
to chancerize bonds, and to annul judgments, specific perform-
ance of covenants, revocation of administrations, injunctions
against actions at law, the setting aside of decrees in admiralty ;
and finally, not to be too tedious in the enumeration, the dis-
tribution, in fee-simple, of the real property of a female *non
compos,* between a person who would give bond to support her,
and her heirs at law ; the latter, however, to give bond to restore
their respective portions, in the event that the unhappy subject

of this experiment should be restored to her senses. Whatever else is proved by this slight and imperfect reference to the records of our general assembly, we need no better proof of the truth of Madison's statement to the people of the United States, that " the legislative department is everywhere extending the sphere of its activity, and drawing all power into its impetuous vortex ; " and of the wisdom also of his warning, that " it is against the enterprising ambition of this department, that the people ought to indulge all their jealousy, and exhaust all their precautions."—Federalist, No. 48, pages 199, 200, 6th ed.

The question before us is, substantially, whether, when in 1843, the people of this state adopted a constitution, they attended to this truth, and heeded this warning so long before given, and constantly standing before them ; or whether, leaving the general assembly in the possession of full judicial power, as well as of legislative, and nearly of executive, this constitution—declared in the *first* paragraph of its *first* article to be of paramount obligation in all legislative, as well as judicial and executive proceedings—was set up by them as a mere " parchment barrier " against the enterprising ambition of the legislative department of the government, which, *as a court*, could expound away every restriction imposed upon it *as a legislature ?*

This can properly be ascertained only by attention to the clauses of the constitution bearing upon this subject; by taking into view their origin and received construction when adopted, if they had any; and by the application to them of the usual rules of interpretation.

These clauses are,

*First.* Section 1, article 4 ; which declares, that " this constitution shall be the supreme law of the state, and *any law* inconsistent therewith shall be void."

*Second.* Section 1, article 3 ; which provides, that " the powers of the government shall be distributed into three departments; the legislative, executive, and judicial."

*Third.* Section 2, article 4 ; which vests " the legislative power, *under this constitution*," " in two houses, the one to be

called the senate, and the other the house of representatives; and both together, the general assembly."

*Fourth.* Section 1, article 7; which vests " the chief executive power of this state " " in a governor, who, together with a lieutenant governor, shall be annually elected by the people."

*Fifth.* Section 1, article 10; which is in these words: " The judicial power of this state shall be vested in one supreme court, and in such inferior courts as the general assembly may, from time to time, ordain and establish." Also, in the same connection, sections 4 and 6 of this article, declaring in substance, that the judges of the supreme court "shall be elected by the two houses in grand committee;" that " each judge shall hold his office until his place be declared vacant by a resolution of the general assembly to that effect, which resolution shall be voted for by a majority of all the members elected to the house in which it may originate, and be concurred in by the same majority of the other house;" and which declare that "such resolution shall not be entertained *at any other than the annual session for the election of public officers;* and, in default of the passage thereof *at said session,* the judge shall hold his place as is herein provided; but, a judge of any court shall be removed from office, if, upon impeachment, he shall be found guilty of any official misdemeanor;" and which further provide, that " the judges of the supreme court shall receive a compensation for their services, which shall not be *diminished* during their continuance in office." Also, section 3, article 14, giving to the supreme court established by the constitution, the jurisdiction of the supreme judicial court, existing at the adoption of the constitution.

*Sixth.* And in special reference to the vote before us, section 2, article 10, " The several courts shall have such jurisdiction as may, from time to time, be prescribed by law. Chancery powers *may be conferred* on the supreme court, but on no other court to any greater extent than is now provided by law;" and

*Lastly.* Section 10, article 4; which declares, that " the general assembly shall continue to exercise the powers they have heretofore exercised, *unless prohibited in this constitution.*"

Taylor & Co. *v.* Place.

We have purposely arranged these clauses of the constitution together, because they all relate to the subject we are considering, and must be viewed and construed in their bearings upon each other, if we would arrive at the result,—their true meaning as a whole. Looking at them in this way, no one at all familiar with such subjects, and the established principles which govern them, can, we think, fail to perceive the unity of design and purpose manifested in them. The powers of government, which, under the old charter, as under all the old colonial charters in this country, had been aggregated in the general *assembly*, as it was called in most of them, and in ours, and in the general *court*, as in some, were distributed among the appropriate departments, that, thus, a just balance of power might obtain among all; the judiciary, the weakest, and therefore, the safest depository of such power, to control the tendency to excess of action in every other department, and especially to check encroachment upon the just limits of its own. The charter, which was well enough for the feeble colony of doubly persecuted Independents to whom it was granted,—nay, in the noble purpose of "the experiment" which it announced, a boon of freedom to all,—had been outgrown by the necessities of the crowded, rich, and flourishing state. The immense amount of property here *in action*, as it is technically called, complicated with contracts, trust settlements, and special equities, required, for the purposes of justice, a much nicer and more systematic judicial administration than the comparative poverty and simplicity of the sparse population of colonial days. In the meantime, the world-famous maxim of Montesquieu concerning the distribution of the powers of government in order to freedom, of which we have spoken, had not only been announced by that great political critic, and been received with acclamation by the enlightened statesmen of Europe and our own country, but, what is of more importance to the matter before us, *had been acted upon* in every one of the numerous state constitutions of the United States, as well as in the federal constitution, for the avowed purpose of securing, and as necessary to secure, the safety of the life, liberty, and property of the citizens. Such a separation of the powers of government, between its different

departments, had, when our constitution was adopted in 1843, and long previous, its well-known history, and its long and firmly established meaning and purpose ; and he who shuts his eyes to these, in construing the comprehensive and apothegmatic clauses of such an instrument, shuts his eyes to the only light which is strong and diffused enough to enable him to perceive their just interpretation. It is quite evident, too, that this distribution of powers was, in our constitution, made for the special purpose of depriving the general assembly of their long exercised judicial power, which, rightly or wrongly,[1] that body

---

[1] The right of the general assembly, under the charter, to act as a court of errors and appeals, and especially, to control the doings of the regular courts of the colony, by prerogative powers, or to give relief as a court of chancery, though undoubtedly exercised during colonial times, seems to have been denied by the home authorities, and at times, at least, repudiated by the assembly itself.

At the August session of the general assembly, 1678, one Colson presented a petition in behalf of the defendant in the case of *Sandford* v. *Forster*, which had been twice tried in the general court of trials, for a reversal the judgment. The assembly, however, refused to interfere, declaring in their vote, that, " this Assembly conceive that it doth not properly belong to them, or any wise within their recognizance, to judge or reverse any sentence or judgment passed by the General Court of Tryalls according to law, except capitall or criminall cases, or mulcts or fines." At the May session, 1680, however, the assembly passed the following vote :

" That in all actionall cases, brought to the General Court of Tryalls, if either plaintiff or defendant be aggrieved, after judgment entered in Court, they may have liberty to make their appeal to the next General Assembly for relief, provided, such appeal be made in the Recorder's office tenn days' time after judgment entered as aforesaid, as alsoe, such person or persons soe appealing shall first pay costs of Court and give in bond as in case of review, and thereupon, execution shall be stopped, till the determination of the Assembly be known."

The court of trials from which this appeal was given to the assembly, was the general council, so called, composed of the governor and assistants, who then sat with the assembly as members of that body, and were afterwards, by act of assembly, passed at the May session, 1696, constituted a separate house of the assembly, and called the upper house.

In 1688–9, complaints having been made to the Lords of Trade and Plantations, concerning the conduct of the colony of Rhode Island, in various matters, instructions were sent by them to the Earl of Bellomont, then governor of New York, Massachusetts, Connecticut, &c. to inquire into and report to them upon

had assumed under the charter. The executive power had been nominal, merely, under the charter; and the constitution extends

the same; and in his letter to the Board, under the date of Nov. 27th, 1699, we find the following:

"§§ 11. The General Assembly assume a judicial power of hearing, trying and determining of civil causes; removing them out of the ordinary courts of justice, and way of tryal according to the course of the common law; alter and reverse verdicts and judgments,—*the Charter committing no judicial power or authority unto them;* neither are the deputies or the representatives, which are the most numerous part of the General Assembly, under any oath or engagement, which was formerly required by an act made in October, *anno* 1672, but afterwards altered and repealed by an act past in 1677."

Notwithstanding the report of the Earl, the general assembly not only continued to exercise a species of superintending judicial authority over the courts of the colony, spoken of by them, as in the nature of chancery power, but, at the October session, 1705, passed the following act, continuing themselves as a court for such purpose, until such time as a court of chancery could be established in the colony.

"An Act for ye Gen'al Assembly to be continued a Court of Chancery untill such time A Court of Chancery can be Erected.

"Whereas it hath been represented to this Assembly the Great benefit yᵗ it might be to have a Court of Chancery erected and settled in this her Maj's Colonie, but this Assembly having considered yᵉ rules & methods for yᵉ way & prosedings in such a Court, with yᵉ rules & constitutions thereof being of great weight and consernment, & requires mature consideration for orderly settling thereof, which we conceive cannot at present, at this Assembly, be settled,

"Therefore Be it Enacted by yᵉ Honᵇˡᵉ yᵉ Coun', with yᵉ house of Majᵉˢᵗ & Representatives, convened in Genˡˡ Assembly, and it is hereby enacted by yᵉ authority of yᵉ same, yᵗ yᵉ Genˡˡ Assembly, at all times convened in Genˡˡ Assembly, shall be a Court of Chancery, as formerly it hath been, untill such time as a more proper Court of Chancery may be conveniently erected & settled."

On the 31st of July, 1710, an appeal from a decree of the general assembly, made at the October session, 1708, in the matter of the redemption of a mortgage, upwards of twenty years old, and taken by Stephen Remington, of Jamestown, was heard before the king and council, in which Jahleel Brenton was the appellee; and the following is a copy from the records of the court of privy council, of their determination of that appeal.

it very little. No jealousy of it, or of its assumption by the enterprising and all absorbing legislative department of the

" At the Court at Kensington, y^e 31st day of July, 1710.

PRESENT:

THE QUEEN'S MOST EXCELLENT MAJESTY.

| | |
|---|---|
| Lord Treasurer, | Lord Dartmouth, |
| Lord President, | Mr. Sec'y Boyle, |
| Duke of Somerset, | Mr. Vice Chamberlain, |
| Earl of Anglesey, | Mr. Chancellor of y^e Exchequer, |
| Earl of Poulette, | Mr. Vernon. |
| Earl of Louden, | |

" Upon the reading this day at the board a report from y^e R^t Hon^ble y^e Lords of y^e Committe for Hearing appeals from y^e Plantations, upon y^e petition and appeal of Stephen Remington, of Jamestown, in the Colony of Rhode Island & Providence Plantations, from a decree given against him at a General Assembly in y^e said Colony, in October, 1708, in favor of Jahleel Brenton. And it appearing y^t y^e proceedings in y^e appellant's cause hath been erroneous, and y^t y^e Court had no jurisdiction therein, Her Maj^tie, with y^e advice of her privy council, is pleased to order as it is hereby ordered, y^t y^e s^d decree, with all issues & proceedings thereupon, be, and they are hereby reversed and declared null and void. And her Maj^tie is pleased to order, & it is hereby ordered, that the Gov^r or commander-in-chief, and y^e magistrates of y^e s^d Colony, for y^e time being, take notice, and govern themselves herein as to them shall respectively appertain.

WILLIAM BLATHWAYT.

In consequence of this determination of the privy council, at the February session of the general assembly, 1712, the following act was passed:

" Whereas, this Assembly having taken into their serious consideration their jurisdiction and authority, as an Assembly, for the tryal and determination of appeals from the Court of Tryalls, especially respecting title of land, together with the judgment and determination of her Majesty and Council upon the appeal of Remington against Brenton, wherein the proceedings of the Assembly was utterly condemned,

" Whereupon, notwithstanding a former act of this Colony which hath constituted and Impowered the Assembly to be a Court of Chancery, we judge they had no power or authority to make any such law, by reason we cannot find any President that the legislators or Parliament of Great Britain, after they had passed an act or Law, took upon themselves the Executive Power or authority of constituting themselves a Court of Chancery, or any other Court of Judicature.

" Yet, notwithstanding, considering the Power and authority of the General Assembly of the Colony, granted them by and in our Royal Charter, Do find

government, did, or could exist.   It was the assumption of judicial power by the general assembly, which *must* have been

---

that this power and authority is very large and copious, as Legislative, to make Laws and constitute Courts of Judicature, for the Tryal and decision of all matters and cases happening within this Colony or Government, as they shall judge proper, according to the Constitution thereof, so as they be not repugnant, but as near as may be, agreeable to yᵉ Laws of England.

" Therefore, be it enacted· by this present Assembly, and the authority thereof, and it is hereby enacted, that the act or law of this Colony which constitutes, authorizes and empowers the Assembly to be a Court of Chancery, shall be, and is hereby repealed, made null and void, and of none effect ; and that no appeal from the Court of Tryalls, for the future, be granted, allowed or brought before the Assembly of this Colony ; and that the gentlemen appealing to this Assembly be Dismist without any costs, save officers fees.

" And also, that the Assembly of this Colony, according to, and by virtue of, their power and authority, afore recited, shall erect, set up and establish a regular Court of Chancery, within this government, according to the methods and Presidents of Great Britain, any act or acts, Laws or Laws, in this Government, to the contrary hereof, in any wise, notwithstanding.

" Always Provided, the said appeals may be, by way of Petition to this or any other Assembly in this Colony, and the petitioners have relief in any matter or thing that may be cognizable before them, or that may at any time hereafter, when a Proper Court of Chancery be stated, have their appeals continued to said Court for Relief, if they shall think fit to prosecute the same."

The resolution expressed in the foregoing act, to establish a court of equity in this state, so that suitors might obtain the necessary relief which the decision of the privy council in *Remington* v. *Brenton* had denied the judicial competency of the general assembly itself to give, does not seem, however, to have been followed by any sudden action ; for it was not until the June session of the general assembly, 1741, that the following act was passed, establishing what was called *a court of equity*, to hear and determine appeals, in personal actions, from the judgments of the superior court of judicature.

" Whereas, the trial of appeals by the General Assembly, from judgments given at the Superior Court of Judicature, hath, by long experience, been found prejudicial, as well to the parties having their causes there determined, as to the government in general, by the public business being neglected."

The act then goes on to repeal the act regulating appeals to the general assembly, and established a court of equity, " to hear all appeals from the judgment of the Superior Court, in personal actions," and to give a determination on said appeals, by " affirming, reversing, or altering the judgment of said Superior Court, agreeably to law and equity, in as full and extensive manner as the General Assembly hath been ·accustomed to do."

specially aimed at by this clause of distribution;—a power grown to be of great importance, as controlling the large and increasing property amassed in the state, and the complicated interests in it, which, from time to time, required to be judicially ascertained and adjusted. As a groundwork for this deprivation, and to meet the new exigency, the judges of the supreme court, who, under the charter, had, like all other officers, been of annual appointment by the general assembly, were endowed with a firmer tenure,—that of good behavior,—unless removed by the joint vote, in separate houses, of a majority *of those elected* to the general assembly in each, passed at the May session, when the members came to the assembly fresh from the people, and before legislative factions could have time to be formed, or to grow unscrupulous in their action against the judges. To the firmer tenure of the members of the court, was united, by the constitution, for the sole purpose of making them independent of the legislative body, this quality in their compen-

---

This court of *equity*, or rather of *appeals* with indefinite powers, was abolished as inconvenient and " a great grievance to the inhabitants of the colony, by an act of the assembly passed at the February session, 1743, and the same act gave, in lieu of the appeal to such a court, to the party who had obtained one verdict, and against whom the last verdict was rendered in the supreme court of judicature, a writ of review, upon which the case was re-tried by a jury in that court.

It is beyond question, however, that in colonial times, prior to 1741, and subsequent thereto, and especially after the trammels of the mother country had been removed by the Revolution, the general assembly, by way of petition in the nature of an appeal, exercised a controlling power over the judicial determinations of the courts of the colony, giving, in what they deemed " hard cases," a relief, called by them *equitable* relief, though without the slightest attention to the principles or restraints of any established system of equity jurisprudence. It is within, too, the recollection of all, that in comparatively recent times, though declining to *re-hear* cases determined by the courts, the assembly has exercised the power of granting new trials in cases determined by the courts, especially after the time had elapsed within which, by law, new trials could be granted by the courts.

[For a large portion of the materials of this note, I am indebted to Hon. Samuel G. Arnold, furnished from the eleventh chapter of his forthcoming History of Rhode Island, and to my associate on the bench, Hon. George A. Brayton. REPORTER.]

sation; that whatever the compensation was, upon which they had consented to accept office, it could not be *diminished* by the general assembly, during their continuance in office.    Again; the assembly might *increase* the jurisdiction of this court, under the general provision,—" that the supreme court shall have such jurisdiction as may, from time to time, be prescribed *by law;* " but that body was forbidden to *diminish* it.    As we have seen, this court was endowed, *by the constitution*, with " the same jurisdiction as the supreme judicial court" had, at the time of the adoption of the constitution, as well as with jurisdiction over all causes pending in, or which might, by existing laws, be appealed to it.    In the same direction, and for the same purpose, the general assembly, though empowered to confer *full chancery powers* upon this court, were expressly prohibited from conferring them upon any other.    The plain import of all this, when compared, as it should be to understand it, with the state of things it was intended to remedy, is, that the people of the state, when they adopted this constitution, desired to have, in their court of last resort, so far as such better constitutional provision would enable it, an educated and independent judiciary, with a comparatively stable tenure of office, and with a jurisdiction, which, whilst it could not be diminished by the legislature, so as to be powerless to resist it, might be increased by it to any extent which the wants of the people might require.

Having thus provided a *supreme* court, as the ultimate state tribunal, stable enough, as against the legislative department, and with jurisdiction enough to enable it to fulfil the proper offices of the judicial department of the state government, the constitution proceeds to vest, by language which had received from the highest judicial authority in the country a settled interpretation to that effect, the *whole judicial power* of the state in *that court*, and in such inferior courts as the general assembly might set up.    This important clause is, as we have seen,

" *The judicial power of this state* shall be vested in one supreme court, and in such inferior courts as the general assembly, may, from time to time, ordain and establish."

The meaning of this clause, connecting it, as we should, with

the other clauses of the constitution relating to the same subject, to make it intelligible, is—that after the adoption of this constitution, judicial power, in the constitutional sense, shall be exercised in this state, not by the general assembly, but only by the *courts* of the state; chancery powers, in the discretion of the assembly, exclusively by the supreme court; and judicial power generally, so far as vested by law in the existing supreme judicial court, shall be exercised by the supreme court, beyond the power of diminution by the assembly; and the remainder of this power, by that court, and by such inferior courts as the general assembly might see fit to establish. We could arrive at no other conclusion from the language and connections of this clause, were the question of its meaning a new one. The *constitution* first distributes the powers of the state government between its different departments, for the purpose of excluding each department from exercising those appropriate to the others. It next proceeds, after vesting " the legislative power " under the constitution, in the two houses of the assembly—" the *chief* executive power of this state, in a governor "—to vest in the same form of language " the judicial power *of the state* "—without qualification, in the courts. Is not the judicial power of the state, *all* the judicial power of the state? If not, what is it? how much less? Does any one doubt that the constitution, by this form of words, vests *all* the *legislative* power in the two houses of the assembly; or imagine that, under the constitution, the supreme court or the governor can exercise it, or any portion of it, except so far as the latter is empowered to give a casting vote when presiding over the senate?

We should never dream that the assumption of legislative powers by the judiciary or the executive, could be constitutional, simply because these branches of the government are too powerless, *successfully* to usurp them! It is only because the legislative body of a state is powerful, both in numbers and influence of members; because it holds the purse, and, under our constitution, appoints as well as pays; because, from these sources of power, to borrow the similes of Madison, its ambition becomes " enterprising," so that it everywhere extends " the sphere of its activity," and draws " all power into its impetuous

vortex;" in fine, it is only because it so much *needs* constitutional control, that the doubt arises whether the constitution *does* control it. Strong as it is, however, it is, alike with the other departments of the government, powerless before the constitution, and the will of the people which that instrument expresses. The constitution was set up by the people to bound the enterprise of its ambition; to limit the sphere of its activity; to rescue, through the aid of the judicial department, the powers of that and the other department of the government from the eddying current of its "impetuous vortex." This court construes the same form of language in the constitution, when applied to the judicial department, to give exclusive judicial power, as when applied, in the same instrument, to the legislative department, to give exclusive legislative power; and sees, in the natural enterprise and force of this latter department, nothing but a necessity for the control, with the administration of which, the court is, by the constitution, entrusted.

But the meaning of the clause of the constitution in question is not to be ascertained by this court as a novel question. As already hinted, these very words had a settled constitutional meaning,—and the very meaning which we have attributed to them; not only when the people of this state adopted them as a part of their constitution, but ever since constitutional law itself, in our American sense of the term, had an existence. This pregnant sentence, is copied into our constitution *verbatim* from the constitution of the United States; where it stands, though without any previous express distribution of powers, as in ours, substantially in the very same connections, and with the same dependencies. In that constitution, however, it may be remarked, that although the clause vesting the legislative power in congress, uses the expression, " *all* the legislative power," the clauses vesting the executive and judicial powers, simply term them, as ours does, " the legislative power," " the executive power," " the judicial power of the United States." In that constitution, and for the same purpose, too, the instrument, after vesting the judicial power in one supreme court, and in such inferior courts as the legislature might establish, and defining to what classes of cases and controversies this power

extends, goes on, as ours does, to fix and establish the jurisdiction of the supreme court, original and appellate; so that the supreme court of the United States derives its jurisdiction directly from the constitution of the United States, as our supreme court derives its jurisdiction from the constitution of this state,—the difference being in form, merely, since the former constitution *specifies* the jurisdiction of its supreme court, whereas the latter fixes the jurisdiction of the supreme court mentioned in it by reference to the jurisdiction of the supreme judicial court, then by law established in this state. Now, from the time of the celebrated discussions explaining the meaning of the constitution of the United States, as proposed to the people, previous to its adoption, and for the purpose of inducing them to adopt it, through every case in the supreme court of the United States, in which this question has directly or indirectly arisen, " the judicial power of the United States " has been construed to mean *all* the judicial power of the United States; and for the very purpose of excluding congress, as well as the President, from exercising or controlling, in any way, the exercise of it in the least. The 81st number of the Federalist is, in its first part, devoted, by Mr. Hamilton, to the very purpose of defending this clause of the constitution of the United States against the charge that it does, as he admits that it does, wholly exclude the legislative department, and either house which composes it, from any share in the exercise of judicial power, even by way of revisal or reversal of a judicial sentence or determination. No one would have thought, at that day even, of attacking it for excluding the interference of congress, or of either house of congress, with the regular adjudication of a case *whilst before the courts,* as in this case, and for the purpose of giving effect to a special act of congress for *that* case, variant from the general law!! We have already quoted this paper for the reasons given by this distinguished statesman for the exclusion. We refer to it now, for the simple purpose of showing, that in the very cradle of the constitution of the United States, the meaning we give to this clause of our constitution, copied from that, was given to it by one of its framers, and its most able and celebrated defender and promoter.

In the note to *Hayburn's case*, 2 Dallas, 410–414 inclusive, it will be found that as early as 1791, it was the unanimous opinion of the judges of the courts of the United States, that this clause vested *the whole* judicial power of the United States in the courts of the United States, free from the control or interference of congress, or of the executive, or of any officer of the executive, or from any revisal or reversal of the judgment of any of these courts,—inferior or superior; and this formed the very ground of their declining to act, as circuit courts, in the execution of the then act of congress regulating the claims of invalid pensioners.   The same meaning is attributed to this clause by Chief Justice Marshall, in giving judgment in the celebrated case of *Marbury* v. *Madison*, 1 Cranch, 173.   In *Martin* v. *Hunter's Lessee*, 1 Wheat. R. 304, the meaning of this very article, and section of the article, of the constitution of the United States, principally attracted the attention of the supreme court of the United States, and involved in it the decision of that leading case by them.   It is in this case that they held that the supreme court of the United States derived its power and jurisdiction *directly* from the constitution, and without need of the intervention of congress.   The very basis of this decision is, that this clause of the constitution, vesting the *whole* judicial power of the United States in the courts of the United States, for the purpose of separating the great departments of government, could not, if there were no such courts provided by congress, be constitutionally exercised at all; and that the constitution being, for this very reason, mandatory upon congress to provide the courts, was alike mandatory and imperative in its language,—to wit, " *shall be* vested,"—in vesting all the original and appellate jurisdiction therein specified in the supreme court of the United States; the words, " *shall be*," being used, as the court construed them, not for the purpose of implying future action by Congress, in order to vest the jurisdiction, but simply to express the command of the people, in the constitution, that it " *be* " vested in that court.   See opinion of whole court, as delivered by Mr. Justice Story, 1 Wheat. R. 327–333, inclusive; and to same effect, see *Osborn* v. *Bank of the United States*, 9 Wheat. 318, 319, per Marshall, C. J.   *Watkins*

v. *Holman et al.* 16 Peters, 60 ; and see decisions of judges in *Hayburn's case ;* and of circuit judges, as given in note to that case, 2 Dallas, 410–414, cited and approved in *The United States* v. *Ferreira,* 13 Howard, 49–51 ; *Benner* v. *Porter,* 9 Howard, 244 ; *State of Pennsylvania* v. *Wheeling and Belmont Bridge Co.* 18 Howard, 431, Nelson, J.; 440, McLean, J. Affirmative words, vesting power under a constitution, are construed as prohibiting the exercise of the power by all other departments of the government, tribunals, or officers, as the case may be, when otherwise, the words would have no operation at all, or, would not have their *full* and *proper* operation. *Marbury* v. *Madison,* 1 Cranch, 174, 175 ; and *Cohens* v. *Virginia,* 395, 398, 400, 401. " The court," says Chief Justice Marshall, in this last case, " may imply negative from affirmative words, where the implication promotes, not where it defeats, the intention ; " (p. 398,)—the rule which has always been applied to the clause distributing the powers of government in all the American constitutions, and which we apply to the same clause of our constitution.

To illustrate this rule by an application of it to the construction of our own constitution, in a matter which circumstances have made quite familiar to the people of this state, the qualification of electors, the times of general elections, and the mode of conducting them, were, previous to the constitution, fixed, and, from time to time, modified and altered by the general assembly. The second and eighth articles of the constitution, however, adjust both these matters ; declaring who " shall thereafter have a right to vote ; " when certain officers " shall be elected ; " what names " shall be placed upon one ticket ; " indeed, how, in general, certain important elections shall be conducted, and what majority " shall be necessary to the election of the persons voted for." In the sixth section of the second article, " full power " is given to the general assembly, amongst other things, " to prescribe the manner of conducting elections ; " and an EXPRESS prohibition is not anywhere to be found in the constitution, depriving the general assembly of their ancient and accustomed power over these all important subjects of their former legislation. The *negation* of power in the general assembly over them, so far as they are regulated by the constitu-

tion, is, under the rule just given, to be implied from the *affirmative* words in which the constitution prescribes *who* shall vote, and *when*, and in what manner, and with what effect, in certain elections; yet no one doubts the implied prohibition, here declared to the general assembly, no longer to act upon these subjects, so far as the people have already acted upon them in the constitution. In the language of the rule laid down by Chief Justice Marshall, such an implied prohibition "*promotes the intention*" of those who framed and adopted the instrument, and so plainly, that the implication is unavoidable, and equivalent to an express and explicit prohibition. Yet, to one familiar with the history and principles of constitutional law, which belong to the ordinary clauses distributing governmental powers among and vesting them in the different departments of the government, the affirmative words giving a class of powers to one department, no less plainly and imperatively prohibit the exercise of them by another, than such words prohibit the general assembly, to the understanding of every one, from altering by law the suffrage and election clauses of the constitution.

To construe, then, the clause vesting the judicial power of the state in the courts, otherwise than as prohibiting its exercise by the general assembly, would be to defraud the people of the state of its meaning, settled by the highest authority, from the hour of its origin, to that in which it was adopted by them into their constitution.

With regard to *chancery* powers, which the general assembly evidently assumed to exercise in this case, they were not only inhibited, by the constitution, from exercising them themselves, but from vesting them to be exercised in any other than the supreme court. The latter appears, from the express language of the second section of the tenth article of the constitution, which provides, that "chancery powers may be conferred on the supreme court, but *on no other court* to any greater extent than is now provided by law;" the last clause of this sentence evidently referring to the well-known statute power of the courts of law to chancerize penal bonds, and, in an action of ejectment brought upon a mortgage to recover the lands mortgaged, to ascertain,

by themselves, or through a master or masters, the amount due upon the' mortgage, according to the rules of equity, and to render a judgment for possession, upon condition only, of non-payment, by the defendant, of that amount; the courts thus administering the equity of redeeming mortgaged estates.   The former is plainly to be inferred from a comparison of the clause just quoted, with the tenth section of the fourth article of the constitution, which provides, that "the general assembly *shall continue to exercise* the powers they have heretofore exercised, unless prohibited by this constitution."   This last clause, it will be observed, is *mandatory* upon the assembly to exercise the powers they have heretofore exercised, unless prohibited; and it is manifest, that of these customary powers, the exercise of which they were commanded to continue, chancery powers were to be excepted, since these they were authorized to *confer* upon the *supreme* court, although upon no other.   The reason of both the limitation and the exclusion is obvious.   There is no class of powers, except those exercised through the preroga-tive writs, which, on account of the specific action attending their exercise, it may be, in any stage of the proceedings, re-quire to be more cautiously used, under the guidance of wisely established rules of decision, than chancery powers; none, in which the judge will otherwise become the tyrant, rather than the minister of the law; and none so improper to be executed by an inferior tribunal, or by a body necessarily composed as all legislative assemblies must be,—whether we consider the want of proper training, in general, on the part of their members, and their entire want of judicial responsibleness, or the dispo-sition to exercise their *will*, rather than painfully to seek the *right*, proper to so imperious and forceful assemblages.   Our conclusion is, that the general assembly are prohibited, by the constitution, from the exercise of all judicial power whatsoever, and especially of chancery powers; which can, by the constitu-tion, be exercised only by the supreme court.

When, therefore, we are told that the general assembly, from the earliest colonial times down to the adoption of the con-stitution in 1843, always exercised at will, judicial power, and especially the judicial power of a court of chancery; and

that, by the tenth section of the fourth article of the constitution, they were to " continue to exercise the powers they have heretofore exercised, *unless prohibited* in this constitution;" our short and true reply is, that the exercise of judicial, and especially of chancery powers, *is* prohibited to them by the constitution; and that we must be false to history, right reason, the settled rules of judicial exposition, the established meaning of the language of the constitution as given unvaryingly by the highest authority, and with that meaning adopted by the people in adopting the constitution, and so false both to the people and the constitution, if we come to any other conclusion.

When we are told, that since the adoption of the constitution, the general assembly have, nevertheless, with the assent of some of the framers of it, exercised, occasionally, judicial powers, including chancery powers;—without deeming it necessary to stop to inquire how often they have done so ; with what objections and protests on the part of members, as a breach of the constitution; our reply is, that neither the convention which framed the constitution, nor its members, nor the members of the general assembly, nor even the general assembly itself, can, *authoritatively*, expound the constitution, but only *the courts*. It is very true that in matters of *doubtful interpretation* the *long continued* practice of the other departments of the government, acquiesced in by the people, under such an instrument, is often properly resorted to by the courts, for the purpose of ascertaining its meaning; and even the authentic debates of the body which framed the constitution have, though with caution, been used in such matters, for the same purpose. We do not, however, deem this question *doubtful in the slightest degree ;* nor the practice in question, if it were, long continued enough, considering the circumstances, to be entitled to weight. It was to be expected, that, in such a body as the general assembly, with so many precedents in its archives for the unrestrained exercise of judicial power, and without *express* words in the constitution prohibiting it to them, the *practice* now invoked to aid the *right*, should, to some extent, continue, until the question of its constitutionality had been examined and decided by the appropriate tribunal. If, indeed, the unconstitutional exercise of a power,

for so short a period as thirteen years, were to weigh with the court in so plain a case, it must be upon the strange ground that an usurpation of power, in derogation of the constitution, always, of itself, affords a constitutional justification for the usurpation.

As little can the opinion of members who sat in the convention which framed the constitution, and afterwards took part in legislation which looks to the exercise of such a power by the general assembly, weigh with the court. It is not always that those who take part in framing constitutions and laws, understand their full import, or their theoretical, or even practical bearings ; and the courts alone are set up, by the constitution, to ascertain the former, and the wisdom of experience is almost always necessary to ascertain the *practical working* of a system of government, or even of a single law.

This is the first time, since the adoption of the constitution, that this question has been brought *judicially* to the attention of the court. The advice, or opinion, given by the judges of this court, when requested, to the governor, or to either house of the general assembly, under the 3d section of the 10th article of the constitution, is not a *decision* of this court; and given, as it must be, without the aid which the court derives, in adversary cases, from able and experienced counsel, though it may afford much light, from the reasonings or research displayed in it, can have no weight as a precedent. We have been referred by the counsel, both for the plaintiffs and for the defendants, to the opinion of the judges of this court given, in 1854, to the general assembly, in answer to a request of that body, with regard to the constitutionality of an act of the general assembly, passed at its January session, 1854, reversing and annulling the sentence of this court, passed ten years before, upon the late Thomas W. Dorr. The judges gave their opinion that the act in question was unconstitutional and void, *as an exercise of judicial power prohibited by the constitution to the general assembly ;* but not having that case now before us, for the purpose of ascertaining how far the prohibition in question *applied* to it, we are satisfied that the reasoning, in the former part of their opinion, from the purpose of the distribution of the govern-

mental powers, under the constitution, that the exercise of judicial power was prohibited to the general assembly, is unanswerably correct. If the latter part of the opinion is to be construed as reserving to the general assembly *ordinary* judicial power, in granting new trials in actions at law; or chancery powers, to be applied by the assembly in pending cases, or, *in any judicial* mode, to cases of accident or mistake; or, as any thing more than that, in the matter before them, they had no occasion to meddle with that question, it was not only wrong, but logically at war with the only ground which they state for their first conclusion. The logic of it, shortly put, would be this: " The general assembly has no power, since the adoption of the constitution, to annul the sentence in question, because that is an exercise of judicial power, and the exercise of that species of power, however customary with the assembly, *before* the constitution, is prohibited to that body by it; but, to grant new trials, and relieve, as a court of chancery, though the exercise of judicial power, is constitutional, *because* the assembly habitually exercised that power *previous* to the adoption of the constitution." It is evident that the ground of the conclusion destroys the reservation, or that the ground of the reservation destroys the conclusion; and whichever way it be, we can hardly believe that the learned judges were guilty of such an oversight. We are inclined to think that when they said " that they did not mean to *intimate* the slightest doubt of the validity" of certain acts of judicial power exercised by the general assembly since the adoption of the constitution, if exercised and acquiesced in by the people since, they are to be understood as meaning that they reserve their opinion upon that subject, as unnecessary and inapplicable to the question before them. But if it was intended as any thing more than this, the reservation was at war with the conclusion, so far as justified by the exercise of judicial power, by the general assembly, before the adoption of the constitution; and certainly, ten or twelve years' infringement, by such a body, of a plain prohibition of the constitution, could not be deemed, upon any principle, to have shot up, in that time, into a right.

We have thus carefully and fully gone through with the

reasons and authorities which bear, or are deemed to bear, upon two of the questions raised in this case; because, as we have had occasion to say before, at this very term, we should not feel justified in declaring the act of a coördinate branch of the state government unconstitutional and void, unless it *plainly so appeared* to us; and because we are solicitous, that upon so important a subject, and one in which we are asserting the constitutional power of our *own* department against the encroachments of another, not only *to be,* but to *seem* to be, in the right. In a case so clear from doubt as this is, we should be equally unworthy of the post of duty in which we are placed by the constitution, if we swerved from the duty which that post devolves upon us, either from want of a just attention to, or a just sense of, the rights of litigants before us, oppressed by an unlawful exercise of power by the assembly, or from a false delicacy growing out of the conflict of power involved in the case between the legislative department of the government and our own. It is the *constitution* which speaks through us, and not we alone, when we declare, as we now do, that the vote and resolution of the general assembly, passed at the January session, 1854, upon the petition of Raymond G. Place and Jason T. Place, and certified to us by the court of common pleas, for the county of Providence, is *unconstitutional* and *void*; and we hereby remand this cause to said court of common pleas, now in session at Providence, with directions to said court to proceed therein according to this decision; and order the clerk of this court forthwith to certify to said court this, our decision, together with the costs of the cause in this court.