June 30, 2020

**Supreme Court**

No. 2017-262-Appeal.
No. 2017-263-Appeal.
No. 2017-264-Appeal.
No. 2017-269-Appeal.
(KC 13-1129)

Manuel Andrews, Jr. et al.          :

v.          :

James Lombardi, in his capacity as Treasurer   :
    of the City of Providence, Rhode Island.

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

**Supreme Court**

No. 2017-262-Appeal.
No. 2017-263-Appeal.
No. 2017-264-Appeal.
No. 2017-269-Appeal.
(KC 13-1129)
(Concurrence begins on page 31)

Manuel Andrews, Jr. et al.      :

v.          :

James Lombardi, in his capacity as Treasurer  :
   of the City of Providence, Rhode Island.

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Chief Justice Suttell, for the Court.** Annual cost-of-living adjustments (COLAs) to the pension benefits for members of the Providence police and fire departments have been the subject of protracted litigation for many years. Such litigation has resulted in several settlement agreements and consent judgments entered in the Providence County Superior Court and opinions issued by this Court resolving legal issues raised by changes to retirement benefits to employees of the City of Providence. Over a decade ago we expressed our fervent hope that we were marking the final chapter in this saga with our opinion in *Arena v. City of Providence*, 919 A.2d 379 (R.I. 2007).[1] *Arena*, 919 A.2d at 381. Alas, the 21st century has brought several economic challenges and the fiscal condition of the City of Providence (the City) in 2011 necessitated changes in several areas of the City's services and obligations. In 2011, when Angel Taveras took office as Mayor

---

[1] The readers who are not familiar with the long and protracted history of pension benefits—and litigation related thereto—for the members of the City of Providence's police and fire departments may wish to refer to this Court's opinion in *Arena v. City of Providence*, 919 A.2d 379 (R.I. 2007), for a relatively thorough history that may help to place the current case in context.

- 1 -

of the City, the realities of the City's pension obligations to its retirees and the condition of its pension fund were soon uncovered and led the City's administration to the conclusion that the system as structured for the then-retirees was unsustainable.

In response, the City enacted an ordinance in 2012 suspending the COLAs for retired members of its police and fire departments until the pension fund achieved a 70 percent funding level. Retiree groups and union groups initiated litigation to bar enforcement of the new ordinance. After engaging in court-ordered mediation, most retirees entered into a settlement which allowed for a ten-year suspension of their COLA benefit. The settlement ripened into a consent judgment after the trial justice determined that the proposed settlement was fair and reasonable. Several dozen individuals opted out of the settlement agreement, however, and instead pursued their civil claims through the litigation process. These claims culminated in a bench trial on the so-called "opt-out" plaintiffs' claims for breach of contract and violation of the Contract Clauses of the United States and Rhode Island Constitutions. The trial justice ultimately found in favor of the City on all of plaintiffs' claims.

The plaintiffs now appeal from the final judgment, arguing that the trial justice erred by finding in favor of the City on plaintiffs' Contract Clause claim and by granting summary judgment prior to trial in favor of the City on plaintiffs' claims for violation of the Takings Clause and for promissory estoppel. For the reasons set forth herein, we affirm the judgment in part and vacate the judgment in part.

## I

### Facts and Procedural History

In 1988, Buck Consultants, LLC (Buck), the actuarial consulting firm that the City had retained, reported that the retirement system was at a 62 percent funding level, with plan assets

valued at $196.46 million and an unfunded actuarial liability of $119.9 million. In 1989, the Providence Retirement Board made changes to its employees' pension benefits, including an increase in the minimum monthly payment and an increase in the compounding COLA to 5 and 6 percent per year. In January 2011, Angel Taveras was sworn in as the City's Mayor. He convened a Municipal Finances Review Panel (MFRP) "to review the City's budget for fiscal years ending June 30, 2011 and June 30, 2012." The five MFRP members included Michael D'Amico, then the City's Director of Administration; Ernest Almonte, former Rhode Island Auditor General; Dennis Hoyle, the Rhode Island Auditor General; Alex Prignano, then Director of Finance for the City; and Kenneth Richardson, certified public accountant.

At the end of February 2011, the MFRP released a report concluding that: (1) 27 percent of the City's retirees were receiving 5 or 6 percent compounding COLAs, (2) the June 2010 actuarial valuation of the City's pension system was 34 percent funded, (3) the fiscal year ending in June 2011 reflected a $69.9 million structural budgetary deficit, and (4) the fiscal year ending in June 2012 reflected a projected $109.9 million structural budgetary deficit. The report also suggested several ways to address the underfunded pension system. In response, Mayor Taveras took several actions to increase revenue and cut costs to the City, "including, but not limited to, the following:

> "a. Reduced the budget for the Mayor's office;
> "b. Reduced the budget for the fire and police departments;
> "c. Laid off personnel;
> "d. Closed schools;
> "e. Revised employment contracts with education and municipal employees;
> "f. Negotiated with tax exempt institutions to include, without limitation, Brown University, Johnson & Wales University and the Rhode Island School of Design to increase the payments in lieu of taxes that these institutions had been making to the City;
> "g. Ordered enhanced enforcement of parking regulations;
> "h. Increased city parking fees;

"i. Increased residential and commercial property taxes; and

"j. Increased the motor vehicle excise tax."[2]

As this Court has recently summarized:

> "In 2011, the General Assembly passed the Rhode Island Retirement Security Act (RIRSA), G.L. 1956 chapter 65 of title 45, legislation focused on promoting the sustainability of municipal pension systems. *See* § 45-65-2. Pursuant to § 45-65-4, a municipality's pension plan would be in 'critical status' if 'as determined by its actuary, as of the beginning of the plan year, a plan's funded percentage for such plan year is less than sixty percent (60%).' A municipality administering a plan in 'critical status' is required, under RIRSA, (1) to give notice of such status to plan participants and other listed individuals and entities and (2) to submit a funding improvement plan detailing the municipality's strategy for emerging from that status. Section 45-65-6. A commission within the Department of Revenue that had been set up under the statute established guidelines for the funding improvement plans, suggesting that, 'generally, the funding improvement period should not exceed 20 years with the plan emerging from critical status within that timeframe.' Municipalities not in compliance with the statute faced a reduction in state aid. Section 45-65-7." *Cranston Police Retirees Action Committee v. City of Cranston*, 208 A.3d 557, 566 (R.I. 2019) (*Cranston*) (brackets omitted), *cert. denied*, 140 S. Ct. 652 (2019).

In October 2011, the City formed a five-member Subcommittee on Pension Sustainability (SPS). The SPS issued a report and recommendations in April 2012, finding that the Mayor's actions had resulted in a reduction to the City's structural deficit by $70 million. The SPS's seven recommendations included:

> "1. Suspend all COLAs on all pensions until the retirement pension system reaches a funding level of 70% ($15.6 million in annual savings);
>
> "2. Require that contributions from all pension system members to continue beyond the current requirement of 25 years of service and, instead, continue as long as members continue to accrue pension credits ($1.5 million in annual savings);

---

[2] The cited quotation is from the parties' Joint Statement of Undisputed Facts, filed prior to the bench trial.

- 4 -

"3. Adjust the base pension benefit to an average of the highest 5 consecutive years of earnings during the final 10 years of a member's employment ($1.3 million in annual savings);

"4. Broad reform of the city's disability pension system, including adjusting current benefits for accidental disability pensions for all active participants from 66 2/3% of the participant's final compensation to 50% of the participant's final compensation, but in no event shall the benefit be less than the participant's service retirement allowance ($500,000 in annual savings);

"5. Place a dollar cap on pension benefits at a level not to exceed one and one-half times the State's median household income;

"6. Require all retirees and their spouses who receive health care benefits to pay a 20% co-pay of all health care costs until retirees and their spouses reach the age of 65 (at which time they will be Medicare eligible); and

"7. Adopt, by ordinance, a formal process for considering and accepting an assumed rate of return on pension investments." (Emphases omitted.)

On April 30, 2012, the Providence City Council passed an ordinance, amending Chapter 17, Article VI of the Providence Code of Ordinances, "suspend[ing] future COLAs for all retired City employees and any beneficiary of a retired City employee who receives a service or disability pension allowance until the system achieved a seventy (70%) funded level" (the 2012 Pension Ordinance or the ordinance). *See* City of Providence Ch. 2012-20, Ordinance No. 276 (Apr. 30, 2012). The City's pension fund had not been at a 70 percent funding level since at least 1970 and the system's "unfunded liability was approaching $900 million[.]" The 2012 Pension Ordinance stated, in pertinent part, that:

"Notwithstanding any other ordinance, collective bargaining agreement, or interest arbitration award, all retired employees and any beneficiary of such employee who receives any service or any ordinary disability retirement allowance or any accidental disability retirement allowance pursuant to the provisions of this article, except for retirement allowances provided for in Sections 17-

- 5 -

189(7)(d) and 17-189(9), shall have their cost-of-living adjustment suspended as of December 31 following the plan year in which the actuary's annual valuation determines the retirement system to be in critical status. Suspension of the annual cost of living adjustment shall continue until such time as the actuary determines in the annual actuarial valuation study that the plan's funded percentage is greater than or equal to seventy percent (70%). Within thirty (30) days of the actuary reporting in the annual actuarial valuation study that the plan's funded percentage is greater than or equal to seventy percent (70%), written notice shall be provided to all members that the cost-of-living adjustment shall be restored on the following January 1." Ch. 2012-20, Ordinance No. 276, Providence Code of Ordinances, Sec. 17-194(3) (Apr. 30, 2012).

A legal challenge to this ordinance and an existing challenge to the City's ordinance that changed the health care benefits for the same retirees (the 2011 Medicare Ordinance) were ordered into mediation by the trial justice. The parties reached a settlement of both matters, whereby the retirees' COLAs would be suspended for ten years (2013 to 2022) and additional health care benefits would be provided to the retirees over and above those provided in the 2011 Medicare Ordinance. The trial justice entered a final consent judgment in April 2013 which reflected the terms of the settlement agreement, and the City amended the 2012 Pension Ordinance to reflect the settlement agreement. *See* Chapter 2013-9, Ordinance No. 162 (Apr. 9, 2013).

Several dozen plaintiffs opted out of the settlement agreement, however, and they initiated the instant cause of action in October 2013 that challenged the constitutionality of the 2012 Pension Ordinance.[3] The plaintiffs sought a declaratory judgment that: (1) the City breached its contractual obligations to each plaintiff by refusing to pay the COLAs to which each is entitled; (2) the 2012

---

[3] At the same time, these plaintiffs initiated a cause of action challenging the constitutionality of the 2011 Medicare Ordinance (the Medicare Case) in KC 13-1128. The cases proceeded together through discovery, pretrial motions, trial, and on appeal. The resolution of the issues raised on appeal in the Medicare Case, however, is set forth in a separate opinion. *See Andrews v. Lombardi*, Nos. 17-255; 17-256; 17-257; 17-260, --- A.3d --- (R.I. 2020), concerning plaintiffs' claims on appeal regarding the 2011 Medicare Ordinance.

Pension Ordinance is both unconstitutional on its face and as applied because it violates the Contract Clauses, Due Process Clauses, and Takings Clauses of the United States Constitution and Rhode Island Constitution; and (3) plaintiffs are entitled to relief under a promissory estoppel theory. The plaintiffs requested an injunction prohibiting the City's treasurer from suspending the COLAs to which plaintiffs were allegedly entitled.[4] The plaintiffs filed a First Amended Complaint on February 24, 2014, which added a few plaintiffs but did not alter the substantive claims or counts.

The City filed a Motion for Partial Summary Judgment seeking summary judgment on plaintiffs' claims (1) that the 2012 Pension Ordinance was unconstitutional because it violated the Takings Clause and the Due Process Clause, (2) that "certain legislative enactments are facially unconstitutional," and (3) for promissory estoppel. The plaintiffs did not oppose the entry of summary judgment on their due process challenges to the ordinance or on the facial challenges to the constitutionality of the ordinance; however, they did object to summary judgment on their as-applied challenge to the ordinance's constitutionality with respect to the Takings Clause and on their claim of promissory estoppel. In a written decision filed on March 16, 2016, the hearing justice granted the City's motion for partial summary judgment with respect to the Takings Clause and promissory estoppel claims.

---

[4] Three of these plaintiffs also filed a petition to hold the City in contempt for its alleged violation of a 2004 consent judgment and 1991 consent decree—both of which arose out of prior litigation cited above (the Contempt Case), KC 13-1127. The hearing justice ultimately denied the petition on the parties' cross-motions for summary judgment, concluding that the proper way to challenge the 2012 Pension Ordinance was through a constitutional challenge, not by petition for contempt. The plaintiffs appealed, and this Court's resolution of the issues raised in the Contempt Case appeal is set forth in a separate opinion. *See Quattrucci v. Lombardi*, Nos. 17-248; 17-249, --- A.3d --- (R.I. 2020).

The case proceeded to a bench trial in April 2016 on the remaining claims: violation of the Contract Clause and breach of contract. The plaintiffs' challenges to the 2011 Medicare Ordinance were tried simultaneously. The parties submitted a Joint Statement of Undisputed Facts before the trial began, detailing the history of the COLAs and some of the City's actions prior to enacting the 2012 Pension Ordinance. The parties also stipulated to the separation of plaintiffs into twelve categories, grouped by the claimed source of their entitlement to the pension benefits, such as consent judgments, settlement agreements, final court judgments, collective bargaining agreements (CBAs), interest arbitration awards, or implied-in-fact contracts.[5]

---

[5] Category A is comprised of nine retired firefighters who were parties to the 1991 Consent Decree between the City, the police union, and the fire union providing annual COLAs to these retirees. Category B is comprised of five retired police officers who were parties to the same 1991 Consent Decree as plaintiffs in Category A. Category C represents twenty-four retired police officers and firefighters who claim an entitlement to an annual COLA pursuant to a collective bargaining agreement (CBA) or were covered by an interest arbitration award (IAA). Category D includes three retired firefighters and one retired police officer who were not covered by a CBA at their respective dates of retirement and who claim an entitlement to an annual COLA pursuant to an implied-in-fact contract. Category E includes two retired police officers and two retired firefighters who, like plaintiffs in Category C, claim an entitlement to an annual COLA pursuant to a CBA, but unlike plaintiffs in Category C, litigated a prior suspension of their COLA payments and had their COLA payments reinstated as a result of the litigation. Three of the plaintiffs in Category E are the plaintiffs before this Court in the Contempt Case. Category F is comprised of nine retired firefighters and one retired police officer who were among the *Arena* plaintiffs. *See Arena*, 919 A.2d at 395 (holding these plaintiffs had a vested right to receive 5 percent COLAs). Category G represents four retired police officers who were plaintiffs in prior litigation (*Abad v. City of Providence*, PC 01-2223) and claim an entitlement to COLAs pursuant to individual settlement agreements with the City. Category H includes two retired firefighters who were plaintiffs in prior litigation (*Bock v. City of Providence*, PC 09-599) and claim an entitlement to COLAs pursuant to individual settlement agreements with the City. Category I has one plaintiff, a retired firefighter who was a plaintiff in prior litigation (*Battista v. City of Providence*, PC 09-6047) and claims an entitlement to COLAs pursuant to a settlement agreement. Category J represents two retired firefighters who were plaintiffs in prior litigation (*Mahar v. City of Providence*, PC 05-5041 and *Thomas v. City of Providence*, PC 05-4547) and claim an entitlement to COLAs pursuant to individual settlement agreements. Category K includes one retired firefighter who, like the plaintiff in Category I, claims an entitlement to COLAs pursuant to an individual settlement agreement stemming from the *Battista* litigation, but unlike the plaintiff in Category I, had no CBA or IAA in place on the date of his retirement. Finally, Category L

During the course of approximately four weeks of trial days, more than fifty plaintiffs testified as well as two experts in the field of actuarial science as it related to municipal pensions (one for plaintiffs and one for the City) and four fact witnesses who had been working for the City at the time the 2012 Pension Ordinance was passed (former Mayor Angel Taveras, former Chief of Staff Michael D'Amico, former Auditor General Ernest Almonte, and former Manager of Benefits for Providence/Deputy Director of Human Resources Margaret Wingate).

In February 2017, the trial justice issued a written decision in which she denied and dismissed plaintiffs' claims for breach of contract and concluded that the 2012 Pension Ordinance had not violated the Contract Clauses of the United States or Rhode Island Constitutions. Final judgment entered in the City's favor on February 24, 2017, and plaintiffs timely appealed. Several notices of appeal were filed, covering the sixty-seven individual plaintiffs; the Court consolidated them into three groups of appeals (the Contempt Case, the Pension Case, and the Medicare Case). This opinion shall address the arguments raised with respect to the 2012 Pension Ordinance, the Pension Case. Two other opinions, issued on even date herewith, resolve the issues raised in the appeals from judgments in the Contempt Case, *see supra* note 4, and the Medicare Case, *see supra* note 3.

## II

### Issues on Appeal

On appeal, plaintiffs make four broad arguments.[6] First, they argue that the 2012 Pension Ordinance specifically excluded certain categories of plaintiffs from its reach and that some of

---

represents one retired firefighter relying on an implied-in-fact contract theory for his claimed entitlement to an annual COLA.

[6] While the individual plaintiffs are represented by three separate attorneys, each of the three attorneys representing his respective group of individual plaintiffs incorporate his brothers' arguments by reference. We have therefore considered each of the arguments raised on appeal as

those plaintiffs were absolutely immunized from any changes to their COLAs because of prior judicial adjudications (the 1991 Consent Judgment, the 2004 Consent Judgment, and this Court's opinion in *Arena*, cited *supra*). Second, plaintiffs collectively challenge the trial justice's conclusion after trial that the 2012 Pension Ordinance did not violate the Contract Clause of either the United States Constitution or the Rhode Island Constitution. The plaintiffs' final two arguments challenge the trial justice's decision to grant summary judgment in favor of the City on plaintiffs' claim of violation of the Takings Clause and claim for promissory estoppel.

**A**

**Effect of 2012 Pension Ordinance on Prior Judicial Adjudications**

The plaintiffs approach their argument that the 2012 Pension Ordinance does not apply to some categories of plaintiffs from two different angles. In one line, plaintiffs contend that the 2012 Pension Ordinance could not modify or supersede a consent judgment entered in Superior Court in 1991 providing a 6 percent COLA to the settlement's beneficiaries (the 1991 Consent Judgment), a consent judgment entered in Superior Court in 2004 providing the precise COLA to which each settlement beneficiary was entitled pursuant to the CBA in place at the date of retirement (the 2004 Consent Judgment), or the final judgment in *Arena*, because to modify or vacate these specific judicial adjudications by legislative action would constitute a violation of the separation of powers doctrine. In the second line, plaintiffs contend that the plain language of the 2012 Pension Ordinance excludes those plaintiffs who claim an entitlement to an annual COLA

_____

applicable to each of the individual plaintiffs. We will refer to the collective "plaintiffs" without distinguishing between the way in which plaintiffs are grouped according to their respective appellate attorney.

- 10 -

pursuant to one of the prior judicial adjudications just described (Categories A, B, E-K, *see supra* note 5).

We begin our discussion by noting that the City Council of Providence has repeatedly attempted to change the COLAs promised to its retirees. *See Arena*, 919 A.2d at 381-82; *City of Providence v. Employee Retirement Board of City of Providence*, 749 A.2d 1088, 1091-92 (R.I. 2000) (*Mansolillo II*); *Mansolillo v. Employee Retirement Board of City of Providence*, 668 A.2d 313, 314 (R.I. 1995) (*Mansolillo I*). In *Mansolillo I*, the Superior Court posed the following question to this Court: Whether the 1991 consent decree was "final and binding so that it cannot be vacated, modified, negated, amended and/or affected without the mutual consent of the parties thereto and/or those affected thereby." *Mansolillo I*, 668 A.2d at 315. This Court replied in the affirmative, *id.* at 317, and there is no dispute that, in the instant case, some plaintiffs were beneficiaries of the settlement memorialized in the 1991 Consent Judgment (Categories A and B, *see supra* note 5).

In *Mansolillo II*, this Court affirmed the trial court's judgment denying the City's motion to vacate the 1991 Consent Judgment and concluding that the 1991 Consent Judgment applied to those retirees who retired on or before the date of entry of the 1991 Consent Judgment only. *Mansolillo II*, 749 A.2d at 1100. In *Arena*, this Court held that retiree-plaintiffs had a vested interest in the COLAs provided in the City's ordinance that had memorialized the COLAs at the root of the litigation resulting in the 1991 Consent Judgment. *Arena*, 919 A.2d at 382-83, 384, 395.

It is well settled that, when a legal dispute is resolved by agreement of the parties and memorialized by a settlement agreement or consent order and the terms of such agreement or order receive the trial court's imprimatur through a consent judgment signed by a justice and entered by the court clerk, the effect of the judgment is absolute unless all parties agree that the consent

judgment should be vacated or one party demonstrates that the consent judgment should be vacated or modified pursuant to Rule 60 of the Superior Court Rules of Civil Procedure based on fraud, mutual mistake, lack of consent, or some other extraordinary circumstance. *See In re McBurney Law Services, Inc.*, 798 A.2d 877, 882 (R.I. 2002) ("When parties to litigation resolve issues through compromise and in good faith, it is well settled that 'courts will enforce the compromised settlement without regard to what the result might, or would have been, had the parties chosen to litigate.'") (brackets omitted) (quoting *Mansolillo I*, 668 A.2d at 316). "A party may not escape its obligations simply because one of the parties may not consider the agreement to be as palatable to them as when they entered into it." *Id.*

While "[t]his [C]ourt has at times likened a consent decree * * * as being 'in the nature of a solemn contract or agreement of the parties made under the sanction of the court[,]'" *Mansolillo I*, 668 A.2d at 316 (quoting *Durfee v. Ocean State Steel, Inc.*, 636 A.2d 698, 703 (R.I. 1994)), "[w]e have long recognized the sanctity of final judgments entered by the various courts in this state and, in particular, consent judgments." *Id.* "We have said that absent fraud, mutual mistake, or actual absence of consent, a judgment entered by consent cannot 'be opened, changed or set aside without the assent of the parties.'" *Id.* (quoting *DeFusco v. Giorgio*, 440 A.2d 727, 729 (R.I. 1982)). "The integrity of any decree or judgment is necessarily derived from its entry by the particular court in the exercise of its judicial function." *Id.* "The fact that it was consented to does not in any way detract from its efficacy. It is to be given the same force and effect thereafter by everyone, including the court, as though it had been entered after a hearing." *Id.* (quoting *Burns v. Burns*, 92 R.I. 278, 281-82, 168 A.2d 141, 143 (1961)).

Although the contractual nature of a consent judgment is beyond dispute, the consent judgment has more weight than contracts that have not received a court's imprimatur as the agreed-

upon solution to a legal dispute. "The consent judgment * * * is clearly protected by the impenetrable posted authority that we know as separation of powers, based upon articles 5 and 10 of the Rhode Island Constitution."[7] *Mansolillo II*, 749 A.2d at 1098. A legislative body is "utterly powerless to enact legislation that would serve to interfere with, set aside, or reopen a judgment that had been entered by the [trial court]." *Id.* (citing *Taylor v. Place*, 4 R.I. 324 (1856)).

The City argues before us that plaintiffs waived their separation-of-powers argument because they did not properly raise it below. The plaintiffs respond that this argument was raised to the trial justice in their motion for summary judgment filed and argued in the Contempt Case prior to the dispositive motions argued in the Pension Case and Medicare Case, and that this issue was indeed addressed by the trial justice in her Contempt Case bench decision denying plaintiffs' motion for summary judgment and granting the City's cross-motion for summary judgment. The transcripts for the arguments and subsequent bench decision support plaintiffs' response. During the October 2014 argument, plaintiffs argued that:

> "There's only one circumstance under which the Court looks at [equitable] factors, and that circumstance is under the conditions of a Rule 60(b) motion. No such motion has been brought here, and I don't think it would be proper for the Court to simply ignore the fact that they haven't followed the Rules of Civil Procedure in terms of how you get relief from an injunction. Because, Your Honor, if the Court does that, it sets a precedent that any municipality at any point in time can violate a court injunction, provided it is confident that later on someday down the road if somebody notices and somebody decides to do something about it, they will be able to defend themselves in court. That's not the way the court system is supposed to work. It's not the way the separation of powers is supposed to work. Cities are not entitled to simply vacate court judgments by fiat hoping that nobody will notice or that, if somebody does, some court will allow them to do so later on."

---

[7] Article 5 of the Rhode Island Constitution provides: "The powers of the government shall be distributed into three separate and distinct departments: the legislative, executive and judicial."

In the trial justice's December 2014 bench decision resolving the cross-motions for summary judgment in the Contempt Case, she stated:

> "[T]his Court cannot conclude that the 2004 consent judgments were either intended to, nor could they have the effect of limiting the action of the City in entering into the CBA[]s with its police and fire. The Court's authority in approving the 2004 consent judgments was limited to the actual terms of the CBA[]s in effect at the time. The Court in 2004 could not have had either the authority or the ability to foresee that at some time in the future the City would choose to enact an ordinance effectively amending the terms of the CBA. The City's authority to enact the ordinance was not, nor could it have been, affected by the 2004 consent judgments. The consent judgments did not purport to restrain the City from taking actions with regard to the COLA[]s or pensions of any other retired police or firefighters or any other individuals aside from the individuals named in the judgments."

The unique nature of this trio of cases filed on the same day involving similar plaintiffs[8] and the same defendant and litigated more or less at the same time or (as with the Medicare and Pension Cases) as a consolidated unit, leads us to conclude that the issue was indeed addressed by the trial justice. Therefore, we shall consider the separation-of-powers arguments presented to us in the instant appeal to be properly before us for consideration.

To be sure, the City was well within its authority to make a legislative change to the retirees' benefits; courts "cannot properly interfere with, or in advance restrain, the discretion of a municipal body while it is in the exercise of powers that are legislative in their character." *New Orleans Water Works Co. v. City of New Orleans*, 164 U.S. 471, 481 (1896). "If an ordinance be passed, and is invalid, the jurisdiction of the courts may then be invoked for the protection of private rights that may be violated by its enforcement." *Id.*; *see id.* at 482 ("If the ordinances already passed are in derogation of the plaintiff's contract rights, their enforcement can be

---

[8] The three plaintiffs who appealed from the final judgment in the Contempt Case are all plaintiffs in this Pension Case.

prevented by appropriate proceedings instituted directly against the parties who seek to have the benefit of them."). The circumstances of the instant case, however, reach beyond the City Council's simple exercise of its legislative authority. The City's past legislative reductions of some of plaintiffs' COLAs had been challenged and resulted in either a consent judgment, a judicially approved settlement agreement, an opinion by this Court, or some combination thereof. The 2012 Pension Ordinance purports to legislate over and around these final judgments, which is an undeniable violation of the doctrine of separation of powers. *See Taylor*, 4 R.I. at 338-39.

In *Taylor*, the defendants sought and secured a legislative do-over to a judgment entered against them in what was then known as the Providence County Court of Common Pleas. After a lengthy discussion regarding the scope and effect of judicial power, Chief Justice Samuel Ames, writing for this Court, stated:

> "To interfere with this jurisdiction; to disturb and control the exercise of this power in such a case; to take the case out of the settled course of judicial proceeding in that court; to set aside its verdict; to open its past judgment; and to give the defendants leave to amend their affidavits, was, therefore, not only the exercise of judicial power on the part of the general assembly over this court and case, but of judicial power of the most eminent and controlling character." *Taylor*, 4 R.I. at 339.

The 2012 Pension Ordinance purported to override the final consent judgments that delineated the COLAs to which some plaintiffs are entitled. As former Mayor Taveras indicated in his testimony, he knew "there would be an issue" by "enacting the COLA [ordinance]."

As we have stated above, there are at least two reasons why the legislative change cannot have any effect over plaintiffs who were parties to cases in which a settlement agreement was reached and a consent judgment entered. First, the City has neither sought nor successfully litigated a motion to vacate the final judgment in any of the cases plaintiffs previously brought to challenge the change to their COLAs. As the trial justice found in her decision after the bench

- 15 -

trial in this case, several plaintiffs were included in either the 1991 Consent Judgment, this Court's opinion in *Arena*, or in individual settlement agreements reached in several different cases initiated and resolved in Superior Court. Second, with regard to these plaintiffs, the 2012 Pension Ordinance has no force or effect because—as we have made clear *supra*—a final judgment, especially one that is the result of a negotiated agreement between the adversarial parties, is the ultimate exercise of judicial power. The City Council's attempt to override these final judgments was a violation of the doctrine of the separation of powers. *See* R.I. Const., art. 5; *Mansolillo II*, 749 A.2d at 1098; *Taylor*, 4 R.I. at 338-39.[9]

There are twenty-nine plaintiffs who were not affected by prior judicial adjudications because they were not parties to either the 1991 Consent Judgment, an individual settlement agreement resolving prior litigation in Superior Court, or this Court's opinion in *Arena* (Categories C, D, and L, *see supra* note 5). We shall proceed to examine their arguments with respect to the trial justice's decision that the 2012 Pension Ordinance did not violate the Contract Clause.

---

[9] The plaintiffs also argue that those who were a party to a prior judicial adjudication (Categories A, B, E-K, *see supra* note 5) were purposely excluded from the reach of the 2012 Pension Ordinance because the language of the ordinance did not include consent decrees, consent judgments, litigation settlement agreements, or the resolution in *Arena* in the "notwithstanding" clause of the ordinance; also, Resolution No. 277, adopted by the City Council the day after the 2012 Pension Ordinance passed, singled out police and firefighters subject to the 1991 Consent Judgment and indicated the City's intent to try again to evade the 1991 Consent Judgment. The plaintiffs contend that the 2012 Pension Ordinance and Resolution No. 277 are *in pari materia* and therefore lead to the conclusion that the City had not intended for these categories of retirees to be affected by the 2012 Pension Ordinance because the City indicated its intent in Resolution No. 277 to find a way to invalidate the 1991 Consent Judgment. The City counters that the 2012 Pension Ordinance clearly applies equally to all retired employees and their beneficiaries without any intentional carve-out for plaintiffs who had sought prior judicial adjudication of changes to the pension benefits. We need not address these arguments in light of our analysis regarding the violation of the separation of powers doctrine and our well settled precedent regarding the effect of final judgments.

# B

## Contract Clause

## 1

## Nonjury Trial Standard of Review

After the bench trial, the trial justice concluded that the 2012 Pension Ordinance had not violated the Contract Clauses of either the United States or Rhode Island Constitutions. The plaintiffs raise several arguments challenging the trial justice's findings and conclusions on this issue. We have a somewhat multifaceted standard of review to consider when reviewing the findings and conclusions from a nonjury trial for a claim of violation of a constitutional right.

We "apply a *de novo* standard of review to questions of law that may implicate a constitutional right." *Cranston*, 208 A.3d at 571 (quoting *Goetz v. LUVRAJ, LLC*, 986 A.2d 1012, 1016 (R.I. 2010)). This Court "will not disturb the factual findings made by a trial justice sitting without a jury 'unless such findings are clearly erroneous or unless the trial justice misconceived or overlooked material evidence.'" *Id.* (quoting *Gregoire v. Baird Properties, LLC*, 138 A.3d 182, 191 (R.I. 2016)). "[W]e accord great weight to [the] trial justice's determinations of credibility, which, inherently, are the functions of the trial court and not the functions of the appellate court." *Gregoire*, 138 A.3d at 191 (quoting *South County Post & Beam, Inc. v. McMahon*, 116 A.3d 204, 210 (R.I. 2015)). "When the record indicates that competent evidence supports the trial justice's findings, we shall not substitute our view of the evidence for his or hers even though a contrary conclusion could have been reached." *Id.* (brackets omitted) (quoting *McMahon*, 116 A.3d at 210). However, "[a] judgment in a nonjury case will be reversed on appeal when it can be shown that the trial justice misapplied the law * * *." *Cote v. Aiello*, 148 A.3d 537, 544 (R.I. 2016) (quoting *Lamarque v. Centreville Savings Bank*, 22 A.3d 1136, 1139 (R.I. 2011)).

- 17 -

**2**

**Contract Clause Framework**

"The Contract Clauses of the United States and the Rhode Island Constitutions prevent the state from enacting laws 'impairing the obligation of contracts.'" *Cranston*, 208 A.3d at 571 (brackets omitted) (quoting U.S. Const. Art. I, § 10, cl. 1; R.I. Const., art. 1, § 12); *see Hebert v. City of Woonsocket*, 213 A.3d 1065, 1085 (R.I. 2019). "[T]he prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula." *Id.* (quoting *United States Trust Company of New York v. New Jersey*, 431 U.S. 1, 21 (1977)). "[T]he Clause routinely has been applied to contracts between states and private parties" and "has been interpreted to apply to municipalities as well." *Id.* at 572 (quoting *Nonnenmacher v. City of Warwick*, 722 A.2d 1199, 1202 (R.I. 1999)). The applicable three-prong analysis under which we analyze claims of violation of the Contract Clause is well established. We must first "determine whether a contract exists." *Id.* (quoting *Nonnenmacher*, 722 A.2d at 1202). "[I]f a contract exists, the court then must determine whether the modification [complained of] results in an impairment of that contract and, if so, whether this impairment can be characterized as substantial." *Id.* (quoting *Nonnenmacher*, 722 A.2d at 1202). "Finally, if it is determined that the impairment is substantial, the court then must inquire whether the impairment, nonetheless, is reasonable and necessary to fulfill an important public purpose." *Id.* (quoting *Nonnenmacher*, 722 A.2d at 1202); *see Hebert*, 213 A.3d at 1087 (reaffirming the burden on this third prong of the Contract Clause analysis).

As we discussed in *Cranston*, the municipality bears a "burden of production as to the reasonable-and-necessary element of the analysis." *Cranston*, 208 A.3d at 573. The trial court is to accord some deference to the government's "proffered evidence for the reasonableness and necessity" of the contractual impairment, but not complete deference because the government's

"self-interest is at stake." *Id.* at 574 (citing *Baltimore Teachers Union, American Federation of Teachers Local 340, AFL-CIO v. Mayor and City Council of Baltimore*, 6 F.3d 1012, 1019 (4th Cir. 1993), then quoting *United States Trust*, 431 U.S. at 26). Furthermore, the government must proffer credible evidence, not just admissible evidence, on this point. *See id.* at 574 n.7 (noting trial justice's rejection of the City of Cranston's request for an "any admissible evidence standard" because a proffer of any admissible evidence would not allow for any level of judicial scrutiny). If the government meets its burden on this third prong, then the burden shifts back to the plaintiff to prove that the contractual impairment was not reasonable and necessary to fulfill a legitimate and significant purpose. *See id.* at 572, 574.

The plaintiffs argue that the trial justice erred by requiring them to prove *beyond a reasonable doubt* that the 2012 Pension Ordinance was not reasonable and necessary to fulfill a significant and legitimate purpose. We addressed an argument regarding the burden of proof for the Contract Clause analysis in *Cranston*, where the same trial justice conducted a Contract Clause analysis of the City of Cranston's ten-year suspension of the COLA for some retirees. *Cranston*, 208 A.3d at 574. We approved her allocation of the burdens of production as well as her application of the "beyond a reasonable doubt" burden of proof, borne by the plaintiff, on the third prong of the analysis once the government had met its burden to proffer credible evidence justifying its impairment of its contractual obligation. *Id.* at 572, 574. Moreover, it is well settled that legislative action, whether state or municipal, "is presumed constitutional and will not be invalidated by this Court unless the party challenging the [legislation] proves *beyond a reasonable doubt* that the legislative enactment is unconstitutional." *Parella v. Montalbano*, 899 A.2d 1226, 1232-33 (R.I. 2006); *see Town of Glocester v. Olivo's Mobile Home Court, Inc.*, 111 R.I. 120, 124, 300 A.2d 465, 468 (1973).

**3**

**Discussion**

The trial justice concluded that each plaintiff proved beyond a reasonable doubt that they were entitled to pension benefits from the City, including COLAs, by way of an express contract or an implied-in-fact contract.[10] The plaintiffs have not challenged the trial justice's factual findings or conclusions with respect to the original source of their right to their pension benefits. The plaintiffs are also not challenging the trial justice's findings or conclusions with respect to the substantial impairment prong of the analysis. The trial justice found that plaintiffs proved beyond a reasonable doubt that they specifically and reasonably relied on the compounded COLAs and, as a result, the 2012 Pension Ordinance substantially impaired their COLA rights.

The plaintiffs' appellate arguments with respect to the trial justice's Contract Clause analysis and conclusions are focused on the third prong: whether the 2012 Pension Ordinance suspending the COLAs until the pension fund reaches a 70 percent funding level was a reasonable and necessary action to achieve an important public purpose.

The trial justice found that the City's fact witnesses and expert witness provided credible evidence establishing that "the ever-increasing unfunded pension liability resulting from the escalating, unmanageable [annual required contribution] payments created an unprecedented fiscal emergency for the City" and that plaintiffs had failed to rebut the City's credible evidence beyond a reasonable doubt that the City had a legitimate public purpose for suspending the COLAs. The

---

[10] As previously stated and as set out *supra* at note 5, the parties stipulated to the separation of plaintiffs into twelve categories, grouped by the claimed source of their entitlement to the pension benefits, such as consent decrees, settlement agreements, final court judgments, CBAs, IAAs, or implied-in-fact contracts. The trial justice examined each of the twelve categories and determined that each category had proved a vested benefit pursuant to either an express contract or an implied-in-fact contract.

- 20 -

trial justice concluded that the 2012 Pension Ordinance was, therefore, passed for a "significant and legitimate public purpose."

To determine whether the City established that the 2012 Pension Ordinance was "reasonable and necessary," the trial justice examined the evidence before her through three factors culled from *United States Trust*, cited *supra*, and set forth by the Second Circuit Court of Appeals in *Buffalo Teachers Federation v. Tobe*, 464 F.3d 362 (2d Cir. 2006), *cert. denied*, 550 U.S. 918 (2007):

> "Ultimately, for impairment to be reasonable and necessary under *less deference scrutiny*, it must be shown that the state did not (1) 'consider impairing the * * * contracts on par with other policy alternatives' or (2) 'impose a drastic impairment when an evident and more moderate course would serve its purpose equally well,' nor (3) act unreasonably 'in light of the surrounding circumstances[.]'" *Buffalo Teachers Federation*, 464 F.3d at 371 (quoting *United States Trust*, 431 U.S. at 30-31).

With respect to the first factor, the trial justice found that the Taveras administration took several actions to address the budget deficit before passing the 2012 Pension Ordinance that suspended the COLAs and that the Mayor and his former staff and advisors provided credible evidence that they had considered several alternative measures, some of which were not implemented for a variety of reasons. The trial justice concluded that the COLA suspension had not been considered "on par with other policy alternatives."

With respect to the second factor, the trial justice found that the City appropriately targeted retiree pension benefits because the unfunded liability of the pension fund was primarily due to the retirees, not to the active employees. The trial justice also found that the ultimate economic loss to plaintiffs was minimal and that the deprivation of the COLA part of the pension benefit was temporary in nature. She ultimately concluded that the City met its burden to show "there was no more moderate course available to adequately address the City's fiscal crisis * * *."

Considering the third factor, the entirety of the circumstances surrounding the suspension of the COLA benefit, the trial justice concluded that the "City presented sufficient credible evidence that the Pension Ordinance was circumscribed, temporary, prospective, and, again, necessitated by a fiscal emergency." She also concluded that the temporary nature of the suspension weighed in favor of finding the impairment of the benefit was reasonable and necessary. Finally, she found that plaintiffs failed to rebut the City's evidence beyond a reasonable doubt.

The plaintiffs argue that the City failed to meet its burden to show credible evidence that the 2012 Pension Ordinance was reasonable and necessary to achieve an important public purpose. The plaintiffs also argue that the trial justice erred when she concluded the 2012 Pension Ordinance was reasonable and necessary because, according to plaintiffs, the City created its own fiscal emergency when it formed contracts with the unions representing the members of the police and fire departments promising 5 and 6 percent COLAs at a time when the pension fund was drastically underfunded and the annual requirement contribution (ARC) payments were growing substantially every year. In addition, plaintiffs argue that the trial justice erred because the City did not demonstrate that other more moderate options, such as a time-limited suspension, a reduction of existing COLAs, or implementing a waiting period for COLAs, would not effectively address the problem before the City suspended the COLAs entirely for an indefinite period. Finally, plaintiffs argue that the trial justice erred by concluding that the COLA suspension, projected to last approximately twenty-four years, was temporary and therefore reasonable.

The City counters that it presented evidence that the City was in a fiscal emergency in 2011 and 2012 and that such emergencies are widely held to constitute a legitimate public purpose for impairing contractual obligations. To be sure, it has long been settled that a state or local

government may exercise its police power to protect the collective public in a time of fiscal strife. *See Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398 (1934). The United States Supreme Court stated long ago that, "[w]ith a growing recognition of public needs and the relation of individual right to public security, the court has sought to prevent the perversion of the [Contract C]lause through its use as an instrument to throttle the capacity of the states to protect their fundamental interests." *Id.* at 443-44, 444 (upholding Minnesota statute passed during economic emergency which allowed homeowners to apply to the courts for a delay of a mortgage foreclosure sale of a home and an extension for the period of redemption as a reasonable exercise of legislative power to protect the welfare of its citizenry). "The principle of this development is * * * that the reservation of the reasonable exercise of the protective power of the state is read into all contracts * * *." *Id.* at 444. Regardless of how the City landed in the fiscal position it was in when Mayor Taveras took office in January 2011, there is no doubt that drastic financial measures had to be taken to address the situation.

After a careful review of the trial record, we have reservations about the trial justice's conclusion that the 2012 Pension Ordinance was reasonable and necessary to achieve the City's important purpose of financial solvency. In *Cranston*, we held that a definitive ten-year suspension of COLAs was temporary in nature. *Cranston*, 208 A.3d at 578. In the case at bar, however, we agree with plaintiffs that "the [2012] Pension Ordinance's lack of a definitive deadline by which COLAs will be reinstated necessarily undermines a finding that it is only 'temporary.'"

In upholding the ordinance suspending COLA benefits in *Cranston*, we placed great emphasis on the fact that the suspension was for a finite period of time:

> "[W]e agree with the trial justice's conclusions that the 2013 ordinances were narrowly tailored to the problem and that the impairment was temporary and prospective in nature because the 2013 ordinances suspended a *future* benefit for a finite period of

- 23 -

time. The 2013 ordinances did not eliminate the COLA benefit altogether, and only affected COLAs not yet made available to retirees." *Cranston*, 208 A.3d at 578.

Here, the COLA suspensions were for an indefinite period of time, i.e., until the pension plan becomes 70 percent funded. We deem this to be unreasonable.

Based on the actuarial evidence presented at trial, the period of COLA suspensions would be approximately twenty-four years from the enactment of the 2012 Pension Ordinance. In addition, William B. Fornia, an expert in "[a]ctuarial science as it relates to municipal pensions[,]" testified that mortality tables indicated that more than half of the plaintiffs, thirty-eight of the sixty-seven, will have died by the time the pension plan attains 70 percent funding. The suspension of COLAs can hardly be called temporary for those pensioners.

Although we affirm the trial justice's findings that the City faced "an unprecedented fiscal emergency" and that the 2012 Pension Ordinance was passed for a "significant and legitimate public purpose," we conclude that she erred in finding that the length of time of the COLA suspension was reasonable and necessary to fulfill an important public purpose.[11] We remand the

---

[11] We also note our disagreement with the trial justice's attribution to plaintiffs' actuarial expert witness William B. Fornia of the year 2036 as the likely year in which the pension fund would reach a 70 percent funded level. A careful review of Fornia's testimony reveals that, when he referenced the year 2036, he was referring to a report authored by Buck, the City's actuarial consulting firm, and not to his own data calculations. At the City Council's request, Buck had "calculated the funding impact on the Employees' Retirement System of the City of Providence of alternative proposed changes in the * * * COLAs" and, in a report dated March 27, 2012, proposed four options and the projected effect of each. Moreover, the testimony of City witness Michael D'Amico also reflected that the City did not anticipate the reinstatement of the COLAs for plaintiffs until 2036. Based on our review of the evidence, the source of the year 2036 as the earliest year in which the City might achieve the 70 percent funding level was from the Buck report, issued prior to the City's decision to pass the 2012 Pension Ordinance, and not from Fornia's own calculations.

We also mention that the trial justice's conclusion that Fornia's calculations were not credible because he testified on cross-examination that he was not concerned about some of the raw data discrepancies in the data set he used to analyze the effect of the COLA suspension on the retirees is belied by the City's expert Daniel Sherman's testimony that he had engaged in similar

- 24 -

case, therefore, to the Superior Court with instructions to determine a reasonable length of time for which the COLA suspension may remain in effect with respect to plaintiffs who were not affected by prior judicial adjudications. *See Hebert*, 213 A.3d at 1088 (remanding case for trial justice to apply the correct standard on the third prong of the Contract Clause analysis).

## C

## Takings Clause

A few weeks before the bench trial started, the trial justice granted the City's motion for summary judgment on plaintiffs' Takings Clause claim. The plaintiffs argue on appeal that she erred as a matter of law when she concluded that the 2012 Pension Ordinance did not constitute a taking pursuant to the Takings Clause of either the Rhode Island or United States Constitutions.

## 1

## Standard of Review

"[T]his Court will review the grant of a motion for summary judgment *de novo*, employing the same standards and rules used by the hearing justice." *Cranston*, 208 A.3d at 580 (quoting *Cancel v. City of Providence*, 187 A.3d 347, 349 (R.I. 2018)). "[T]he trial court's decision will be affirmed 'only if, after reviewing the admissible evidence in the light most favorable to the nonmoving party, we conclude that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law.'" *Id.* at 580-81 (quoting *Cancel*, 187 A.3d at 350). "In a motion for summary judgment, 'the nonmoving party bears the burden of proving by competent evidence the existence of a disputed issue of material fact and cannot rest upon mere

analytical methods and concurred with Fornia's calculations. Although we accord great weight to a trial justice's determinations of witness credibility, *see Gregoire v. Baird Properties, LLC*, 138 A.3d 182, 191 (R.I. 2016), our review of the record has called this particular credibility determination into doubt.

allegations or denials in the pleadings, mere conclusions or mere legal opinions.'" *Id.* at 581 (quoting *Cancel*, 187 A.3d at 350).

**2**

**Discussion**

"The Takings Clauses of the United States and Rhode Island Constitutions provide that a government may not take private property for public use 'without just compensation.'" *Cranston*, 208 A.3d at 581 (quoting U.S. Const. Amend. V; R.I. Const., art. 1, § 16). "The first step in the analysis of a takings claim is to determine whether a recognizable property right is at stake." *Id.* (citing *Parella v. Retirement Board of Rhode Island Employees' Retirement System*, 173 F.3d 46, 58 (1st Cir. 1999)). The trial justice concluded that, pursuant to this Court's discussion and holding in *Arena*, plaintiffs had "a constitutionally protected property interest in COLAs," and the City has not filed a cross-appeal. Similar to our approach in *Cranston*, therefore, "we assume, without deciding, that plaintiff[]s * * * have a protected property interest in future COLA payments." *Id.*

The issue plaintiffs raise before us is whether the 2012 Pension Ordinance should be examined as a physical taking or a regulatory taking. The plaintiffs argue that the trial justice's application of the Takings Clause was flawed and she erred by concluding that the City was entitled to summary judgment on this claim. The plaintiffs urge us to consider the long-term suspension of COLAs in the 2012 Pension Ordinance to be a *per se* physical taking, rather than a regulatory taking. The plaintiffs claim that the City's appropriation of an identifiable fund of money from private citizens renders the action akin to the *per se* taking found by the United States Supreme Court in *Horne v. Department of Agriculture*, 135 S. Ct. 2419 (2015), among other cases. The City argues that the trial justice appropriately examined the 2012 Pension Ordinance as a regulatory taking and did not err when she granted summary judgment in its favor.

- 26 -

As we recently stated, "[p]hysical takings (or physical invasion or appropriation cases) occur when the government physically takes possession of an interest in property for some public purpose." *Cranston*, 208 A.3d at 581 (quoting *Buffalo Teachers Federation*, 464 F.3d at 374). "Physical takings 'are takings per se and always necessitate compensation.'" *Id.* (quoting *Brunelle v. Town of South Kingstown*, 700 A.2d 1075, 1081 (R.I. 1997)). In *Horne*, the United States Supreme Court clarified that the physical taking of property can occur with personal and real property, and that all physical takings of property require just compensation pursuant to the Fifth Amendment to the United States Constitution. *Horne*, 135 S. Ct. at 2424, 2425, 2426, 2428 (holding that the Department of Agriculture's requirement that raisin growers set aside a government-determined percentage of some year's crops for the government to distribute was a *per se* physical taking requiring compensation in the same way that taking real property requires just compensation). The Supreme Court held that the government could not avoid its duty to pay compensation for *per se* physical takings by "reserving to the property owner a contingent interest in a portion of the value of the property, set at the government's discretion." *Id.* at 2428.

"In contrast, 'a regulatory taking transpires when some significant restriction is placed upon an owner's use of his property for which justice and fairness require that compensation be given.'" *Cranston*, 208 A.3d at 581-82 (brackets omitted) (quoting *Philip Morris, Incorporated v. Reilly*, 312 F.3d 24, 33 (1st Cir. 2002)). "Regulatory takings are further subdivided into categorical and non-categorical takings." *Id.* at 582 (quoting *Sherman v. Town of Chester*, 752 F.3d 554, 564 (2d Cir. 2014)). "'Anything less than a complete elimination of value, or a total loss, is a non-categorical taking, which is analyzed under the framework created in' *Penn Central Transportation Company v. City of New York*, 438 U.S. 104 (1978)." *Id.* (quoting *Sherman*, 752 F.3d at 564). "In *Penn Central*, the United States Supreme Court listed three factors it considered

of 'particular significance' in the regulatory taking analysis: (1) 'the economic impact of the regulation on the claimant'; (2) 'the extent to which the regulation has interfered with distinct investment-backed expectations'; and (3) 'the character of the governmental action.'" *Id.* (brackets omitted) (quoting *Penn Central*, 438 U.S. at 124) (the *Penn Central* factors).

Since identifying the *Penn Central* factors, the Supreme Court has held that "the fact that legislation disregards or destroys existing contractual rights does not always transform the regulation into an illegal taking." *Connolly v. Pension Benefit Guaranty Corporation*, 475 U.S. 211, 217, 224, 225-27 (1986) (brackets omitted) (citing *Bowles v. Willingham*, 321 U.S. 503, 517 (1944)) (holding legislation enacting a fine for employers that withdrew from a multiemployer pension plan was not a regulatory taking pursuant to the *Penn Central* factors). "This is not to say that contractual rights are never property rights or that the Government may always take them for its own benefit without compensation." *Id.* at 224.

There is no doubt that the COLA suspension in this case represents the denial of an expectancy on the part of plaintiffs, and not the removal of tangible property already given to them. We recently stated that the prospective nature of the change to a plaintiff's contractual right to an annual COLA was different from a government entity taking back "a payment already made to retirees to appropriate the money for its own use." *Cranston*, 208 A.3d at 582. In *Cranston*, this Court considered the suspension of the contractual right to an annual COLA to be subject to the regulatory taking analysis rather than as a *per se* physical taking. *Id.* Here, the trial justice considered the 2012 Pension Ordinance to be analogous to the city employee wage freeze in *Buffalo Teachers Federation*, cited *supra*, where the Second Circuit Court of Appeals held that the wage freeze put in place for City of Buffalo employees was to be examined pursuant to the *Penn Central* factors as a potential regulatory taking rather than a *per se* physical taking. *See Buffalo*

*Teachers Federation*, 464 F.3d at 367, 374, 375. While plaintiffs urge us to consider the COLA suspension as akin to the physical taking of the raisins in *Horne*, we see no reason to deviate from the precedent established last term in *Cranston*.

In *Cranston*, we affirmed the grant of summary judgment on a Takings Clause claim concerning COLA benefits. *Cranston*, 208 A3d at 583. In doing so, we relied on the undisputed facts that the ordinances at issue in that case "effectuate[d] only a limited suspension of a small part of the overall pension retirement benefits, and * * * were prospective[.]" *Id.* In other words, the COLA suspension was "temporary[,]" "impact[ed] only part of the total pension benefits received[,]" did not affect any COLA payments previously made, and "was motivated by a critical need to improve the health of the City's pension system." *Id.*

In light of our mandate to remand this case for the trial justice to determine a reasonable length of time for which the COLA suspension may remain in effect, we are satisfied that the same factors obtain and that *Cranston* is controlling with respect to plaintiffs' Takings Clause claim.

**D**

**Promissory Estoppel**

When the trial justice granted summary judgment in the City's favor on plaintiffs' claim for violation of the Takings Clause, she also granted summary judgment in the City's favor on plaintiffs' claim for promissory estoppel. She concluded that the City was entitled to judgment as a matter of law on this claim because, in her words, this Court made clear that "promissory estoppel is not applicable to public pension cases." (Citing *Retired Adjunct Professors of State of Rhode Island v. Almond*, 690 A.2d 1342, 1346 (R.I. 1997)). The plaintiffs argue before us that

the trial justice erred as a matter of law when she concluded that promissory estoppel was not available in a public pension case.

Promissory estoppel, as defined by this Court, is "a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance, and therefore is binding if injustice can be avoided only by enforcement of the promise." *Cote*, 148 A.3d at 547 (brackets omitted) (quoting *Filippi v. Filippi*, 818 A.2d 608, 625 (R.I. 2003)). "Application of the doctrine of promissory estoppel also has been extended 'to situations in which the promisee's reliance on the promise was induced, and injustice may be avoided only by enforcement of the promise.'" *Id.* (quoting *Filippi*, 818 A.2d at 625).

However, this Court has often declined the invitation to address arguments or claims based on a theory of promissory estoppel when an enforceable contract exists between the parties. *See, e.g.*, *Haviland v. Simmons*, 45 A.3d 1246, 1260 (R.I. 2012) ("Because we are satisfied that an express, enforceable contract arose between the parties, we need not reach plaintiff's contention that she is entitled to relief based on a theory of promissory estoppel."); *DeAngelis v. DeAngelis*, 923 A.2d 1274, 1280 n.9 (R.I. 2007) ("[S]ince we have upheld the validity of the oral contract, defendant's contention concerning promissory estoppel is of no real-world significance in this case."). Based on our *de novo* review of this issue, the City was entitled to summary judgment on the plaintiffs' claim for promissory estoppel because the trial justice found that each plaintiff had a contract with the City (whether express or implied-in-fact) and these findings have not been challenged on appeal. With contracts in place for each plaintiff, we need not consider whether the City is liable to the plaintiffs pursuant to the theory of promissory estoppel. *See Haviland*, 45 A.3d

at 1260; *DeAngelis*, 923 A.2d at 1280 n.9.  The entry of summary judgment on the plaintiffs' promissory estoppel theory is, therefore, affirmed.

## III

## Conclusion

For the reasons set forth throughout this opinion, the judgment of the Superior Court is affirmed in part, vacated in part, and reversed in part.  The entry of summary judgment in the City's favor on the plaintiffs' claims under the Takings Clause and for promissory estoppel is affirmed.  We reverse the judgment with respect to all of the plaintiffs who were also a party in prior litigation regarding their COLA benefits and who were included in either the 2004 Consent Judgment, 1991 Consent Judgment, an individual settlement agreement, or were a plaintiff in *Arena* (Categories A, B, E, G, H, I, J, K, *see supra* note 5).  The 2012 Pension Ordinance is unenforceable as to these individuals for the reasons articulated above, and we direct the Superior Court to enter judgment in favor of these plaintiffs.  With respect to the plaintiffs' challenge to the 2012 Pension Ordinance based upon the Contract Clauses of the United States and Rhode Island Constitutions, we vacate the judgment and remand for a determination of a reasonable length of time for the COLA suspension to remain in effect.  The record of this case shall be returned to the Superior Court.

**Justice Robinson, concurring.**  I concur in the laudably well-reasoned and well-written majority opinion in this case.  It unquestionably applies existing Contracts Clause jurisprudence accurately to the facts of this case; and, in hewing to that jurisprudence, it quite understandably finds fatally flawed the temporally unlimited legislation being reviewed.

- 31 -

However, I feel compelled to say that, while sincerely respecting the judicial craftsmanship that underlies the Court's opinion, I am able to concur in its Contracts Clause analysis only unenthusiastically and in a decidedly *dubitante* frame of mind. I feel that it is important for me to reiterate my previously expressed view that the time for revisiting our Contracts Clause jurisprudence is overdue. *See Cranston Police Retirees Action Committee v. City of Cranston*, 208 A.3d 557, 592-95 (R.I. 2019) (Robinson, J., concurring).

I simply wish to state in a respectful tone my deeply held belief that the United States Supreme Court has erred by straying too far from the clear constitutional prohibition against laws that impair the obligations of contracts. I see no need to repeat here everything that I wrote last year in that regard in *Cranston* (*see id.*), but I remain as concerned today with the general drift of Contracts Clause jurisprudence over the past several decades as I was then. And I would once again direct the reader's attention to the powerful and thought-provoking dissent of Justice Neil Gorsuch of the United States Supreme Court in the case of *Sveen v. Melin*, 138 S. Ct. 1815, 1826-31 (2018) (Gorsuch, J., dissenting). *See* Douglas W. Kmiec & John G. McGinnis, *The Contract Clause: A Return to the Original Understanding*, 14 Hastings Const. L.Q. 525 (1987). While I personally would be sympathetic to truly extraordinary situations in which an "absolutist" approach to the prohibition against the impairment of the obligation of contracts would be inappropriate, it is my view that the instant situation should not properly be so classified—although I repeat that this Court's opinion today is consistent with currently prevailing precedent.

I conclude by observing that one of the most distressing features of decisions like the one in *Cranston* or in the instant case is that they in effect reward or immunize prior governmental ineptitude. To be blunt, the elimination of annual cost-of-living adjustments (COLAs) that has brought this case to this Court was deemed to be necessary because of what the fiscal

- 32 -

irresponsibility of previous municipal administrations had brought about. That regrettable fact radically distinguishes the instant case from what was at issue in the famous decision of the United States Supreme Court in *Home Building & Loan Association v. Blaisdell*, 290 U.S. 398 (1934). The Minnesota statute (enacted in 1933) that resulted in the impairment of the obligation of certain contracts that a 5-4 majority of the Supreme Court held not to be unconstitutional was an attempt by the legislature to alleviate the impact of the Great Depression on presumptively innocent mortgagors. *Blaisdell*, 290 U.S. at 415-18, 447-48, 483. It was not a *post hoc* attempt to rob Peter to pay Paul by targeting a finite number of retired municipal employees who had a contractual entitlement to COLAs—all for the purpose of restoring a degree of municipal fiscal integrity after a period of gross governmental fiscal irresponsibility.

I will say no more, but I do remain profoundly concerned about the distance we have traveled from the clear language in both the United States Constitution and the Rhode Island Constitution prohibiting the impairment of the obligation of contracts. I conclude by repeating what I said a year ago in the *Cranston* case:

> "I for one yearn for the day when the courts will revert to something substantially closer to an 'absolutist' understanding of the Contracts Clause. In the meantime, however, I bow obediently, but discontentedly, to the result that prevailing precedent dictates." *Cranston*, 208 A.3d at 594 (Robinson, J., concurring).

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

SUPREME COURT – CLERK'S OFFICE

OPINION COVER SHEET

| Title of Case | Manuel Andrews, Jr. et al. v. James Lombardi, in his capacity as Treasurer of the City of Providence, Rhode Island. |
| --- | --- |
| Case Number | No. 2017-262-Appeal. No. 2017-263-Appeal. No. 2017-264-Appeal. No. 2017-269-Appeal. (KC 13-1129) |
| Date Opinion Filed | June 30, 2020 |
| Justices | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| Written By | Chief Justice Paul A. Suttell |
| Source of Appeal | Kent County Superior Court |
| Judicial Officer From Lower Court | Associate Justice Sarah Taft-Carter |
| Attorney(s) on Appeal | For the Plaintiffs: <br><br> Lauren E. Jones, Esq. <br> Kevin F. Bowen, Esq. <br> Thomas M. Dickinson, Esq. <br> Thomas J. McAndrew, Esq. <br> Robert S. Thurston, Esq. |
| | For the Defendant: <br><br> Nicholas L. Nybo, Esq. <br> Kenneth B. Chiavarini, Esq. <br> William M. Dolan, Esq. <br> Matthew T. Jerzyk, Esq. <br> Jeffrey M. Padwa, Esq. <br> William K. Wray, Jr., Esq. <br> Jeffrey T. Dana, Esq. |